ATLAS COAL COMPANY, appellant, v. LESLIE JONES et al., appellees.

No. 48318.

(Reported in 61 N.W.2d 663).

DECEMBER 15, 1953.

REHEARING DENIED FEBRUARY 11, 1954.

Gilbert & Scholz, of Oskaloosa, for appellant.

Bray, Carson & McCoy, of Oskaloosa, for appellees.

OLIVER, J.—This is an equity suit brought by Atlas Coal Company, an Iowa corporation, against E. R. Berwick and Leslie Jones, two former officers and directors, and White City Coal Company, a corporation owned by them, involving certain coal contracts or leases which plaintiff alleges Berwick and Jones secured from plaintiff fraudulently, in bad faith and in violation of their fiduciary duties to plaintiff. Plaintiff prays said leases and a sublease or subcontract made thereunder and royalties secured therefrom be adjudicated to be held by defendants as trustees for plaintiff and be ordered assigned to plaintiff, and for an accounting in connection therewith and for general equitable relief.

Plaintiff was organized in 1933 to engage in the business of mining and dealing in coal. Its principal place of business is Oskaloosa. Until 1949 it was actively engaged in strip mining in Mahaska County. Its capital stock consisted of one thousand shares of nonvoting preferred stock at $100 per share and one thousand shares of common stock issued at $1.00 per share. Its business was successful and by June 1949 it had retired its preferred stock and had a surplus of $132,000 after paying common stock dividends of $57,000 in the previous fiscal year.

At first it conducted strip mining operations upon an eighty-acre tract purchased by it, upon which it constructed its processing plant and tipple. It also mined in adjacent properties leased by it. Later it secured coal contracts or leases in three other areas in the county, known as Eddyville field, Kirkville field and White City field, which it planned to work out in order.

Defendant Leslie Jones had been connected with Atlas Company since 1936. Later he was made assistant treasurer and treasurer. He was a director and secretary-treasurer from 1946 until the annual meeting in May 1951. From 1947 to 1951 his salary was $500 per month. From 1947 to 1949 Jones handled the business end of Atlas. Another director, Tom Lanning, handled its operations. Lanning gave up this work in July 1949, and Jones was in active charge of the operating end of the business in Mahaska County until May 1951.

Atlas Coal Company was controlled by A. E. Hollingsworth, of Des Moines, who owned one hundred and twenty shares of its common stock and controlled Central Iowa Fuel Company which held four hundred and eighty-four shares. By 1949 he was failing physically and was less active mentally. Early in 1951 a guardian was appointed for him. He died shortly thereafter. Defendant E. R. Berwick was a protégé of Hollingsworth, was on the payroll of several of Hollingsworth's enterprises and voted Hollingsworth's stock at the 1949 Atlas meeting. In 1947 he was elected director and was made assistant to the president of Atlas (Hollingsworth) at $100 per month. He was re-elected director in 1948 and in 1949 was elected director and president. His salary for 1948 and 1949 was $500 per month. From 1949 to 1951 Berwick and Jones were the principal acting officers of Atlas and were the only salaried officers. Berwick's office was in Des

Moines. Jones made notes of stockholders' and directors' meetings from which Berwick typed the minutes. The latter had possession of the minute book. Jones kept all other books and records of Atlas at the office in Mahaska County.

The directors elected in 1949 were Hollingsworth, Berwick, Jones, Tom Lanning and R. L. Read. Read was a practicing attorney of Des Moines. He held stock in and his firm was attorney for Central Iowa Fuel Company. In 1950 the same directors were elected except Read, whose place was taken by Fred Mac-Millan.

Atlas worked out its original field in 1944 and Eddyville field in 1948. It then considered disposing of the Kirkville and White City fields and also its machinery and equipment.

May 17, 1949, Atlas sold its main mining machine, a large dragline, for $158,000. June 27, Jones offered to purchase the Atlas stock held by Central Iowa Fuel Company. The offer was refused. At the annual stockholders' meeting of Atlas, June 29, 1949, a resolution prepared by R. L. Read was adopted, authorizing and directing the Board of Directors to determine whether Atlas should liquidate, remain inactive or actively engage in mining operations, and authorizing the Board to sell all or part of the assets at such prices and on such conditions as the Board should determine.

At the annual directors' meeting held July 1, 1949, Mr. Read referred to this resolution, and stated he had concluded Atlas should liquidate. Upon his motion the Board adopted a resolution:

"(1) That this Company cease active operations, other than to fulfill its contract obligations, until the further order of the Board;

"(2) That officers of this corporation be and they are hereby authorized and directed to consider ways and means of disposing of the assets and properties of this company, either as a whole or in parcels, and that they report back to this Board in respect of any propositions that they may be able to negotiate for;

"(3) That no further advance royalties be paid on either the White City or the Kirkville fields until and unless authorized by this Board;

"* * *;

"(6) That in the event that the Company is unable to dispose of its assets on favorable terms, and in case economic and other conditions would seem to warrant doing so, that this Board shall give further consideration to embarking in active mining operations in the Kirkville field."

Read testified he then thought they could readily dispose of both the Kirkville and White City fields and get back their investment in them, or at least get someone to operate them.

The Kirkville field was sold to director Tom Lanning for $32,900 and certain equipment was sold him for $15,800. The contracts were signed about July 18, 1949. Whether the sale of Kirkville field was authorized at the July 1, 1949, directors' meeting is in dispute. There is no reference to either transaction in the minutes of any directors' or stockholders' meeting. In any event, the validity of neither is questioned. Lanning was asked to buy the White City field also but he said he had as much as he could handle.

This suit involves the coal contracts or leases in White City field which defendants secured from Atlas for $10. Atlas had an investment in them of $20,600 for advance royalties and $3825.24 for maps, plats and drilling expense. White City field embraced four contracts or leases with the owners of the real estate:

(1) Lee contract, made in February 1944, covering one hundred and thirty acres, providing for a royalty of fifteen cents per ton, with an advance royalty of $3000 per year. (This was the most important contract.)

(2) Chapman contract, June 1941, one hundred and twenty acres, royalties ten cents per ton, advance royalty $100 per year.

(3) Nash contract, October 1941, one hundred twenty acres, royalty ten cents per ton, initial advance royalty $100 per year, increasing $50 per year.

(4) Underwood contract, October 1941, fifty acres, royalty ten cents per ton, initial advance royalty $100 per year, increasing $100 per year.

These contracts were drawn by lawyers for Atlas and were quite favorable to Atlas. Each provided royalty payments should

continue only until the sinking of a pit or shaft on the premises through which the coal could be removed and that advance royalties paid should be credited upon the royalty of ten or fifteen cents per ton of coal mined, so that no further royalties would be owing until the credit for advance royalties should be exhausted. Each provided also that when the coal was exhausted or in the sole judgment of Atlas, unworkable at a profit, the agreement should terminate and, in addition, that the liability of Atlas for advance royalty or royalty per ton should cease upon the termination of the contract for forfeiture or otherwise. Upon default of Atlas the other party could terminate the contract by sixty days written notice.

On July 1, 1949, Berwick and Jones had been instructed to secure propositions for the disposal of these and other assets of Atlas and to report back to the Board. September 10, 1949, President Berwick was given a written notice addressed to Atlas, of the landowners' intention to cancel the Lee lease in White City field, for default in the $3000 advance royalty payment due July 1, 1949, if said default continued thereafter for sixty days. After receiving this notice Berwick waited until October 18 before calling a meeting of the Board. At that meeting a resolution offered by Read was adopted as shown in the minutes:

"That E. R. Berwick shall continue to try to dispose of the White City field until November 1, 1949, and if unable to sell leases by that date, then he shall offer the leases to Leslie Jones for the sum of $10.00, with proper contract to hold the Atlas Coal Company harmless from any liability thereunder. It is further resolved that Berwick is hereby authorized to dispose of the White City leases at whatever price he may be able to get, and shall have sole discretion in this matter, providing that the purchaser shall be financially responsible, and shall contract to assume the obligations of the Atlas Coal Company under said leases, and hold it harmless from all obligations thereunder."

Read testified: "I offered that motion because Jones and Berwick, and particularly Berwick, had been telling me ever since July that this was hopeless, that they couldn't find anybody and had exhausted themselves and absolutely couldn't find anybody, and they thought they never could find anybody. Rather

than see what I thought was a thing of value lost for everybody I was willing that Les [Jones] should take it over. * * *

"That's right, all the directors voted in favor of my resolution * * * but they squawked."

According to Berwick and Jones, on November 1, 1949, Berwick went to Oskaloosa and discussed with Jones the taking over of the White City field and they arranged to have assignments of the leases prepared. Jones testified he asked Berwick to go in with him on the proposition; that on the 4th or 5th Berwick said he would do so on condition his payment be limited to $2000. At that time $4400 was or would shortly be due on advance royalties. November 7, Jones and Berwick executed Articles of Incorporation of White City Coal Company of which they were the sole stockholders, officers and directors. November 7, Berwick executed for Atlas, a written instrument selling and assigning to Jones the four leases and also the drilling records and plats of the coal fields in the White City field. On that day Jones issued to Atlas a $10 check of White City Coal Company. November 8, Berwick executed assignments of the leases from Atlas to Jones. November 16, Jones assigned the leases to White City Coal Company. November 23, White City Coal Company entered into a contract with Ed Prothero granting him the right to remove coal from all the land covered by the White City leases. Prothero agreed to commence mining operations within thirty days, to mine at least 25,000 tons of coal per year, to pay White City Coal Company a royalty of twenty-two cents per ton on the first 75,000 tons and thereafter twenty cents per ton. Prothero paid White City Coal Company $2500 as advance royalties. He also paid White City Coal Company $1000 to apply on the purchase price of Atlas's maps, plats and drilling records of White City field which defendant coal company sold him for $2500. The $1500 balance on this item was represented by the two cents per ton additional royalty on the first 75,000 tons mined.

Prothero started to remove coal in January 1950, and by March 1, 1952, just previous to the trial of this case, had paid White City Coal Company $12,695.16 as royalties, at twenty-two cents per ton, or a total of $13,695.16. Atlas continued to operate

its processing plant and tipple and purchased, processed and sold part of the coal mined by Prothero. Atlas had previously paid advance royalties of $20,600 on the White City contracts and Jones and Berwick would be required to pay $3000 more on the Lee contract and $1400 on other contracts for advance royalties accruing before mining operations were commenced by Prothero.

Prothero had previously "been engaged in mining business off and on" in that neighborhood. In July 1949 Atlas sold him some machinery to move dirt for building roads, etc. He met Jones in connection with that deal. Apparently at that time Prothero told Jones he was looking for a coal field for winter work. Jones showed him only unworked parts of some old Atlas leases. Prothero did not want those. Jones testified he happened to meet Prothero a few days after he secured the White City leases from Atlas, and told Prothero about White City field and negotiations followed which resulted in the contract between White City Coal Company and Prothero. Prothero required financial assistance and Jones loaned him $2500. Jones also bought about $2000 of. Prothero's secured indebtedness. At the time of trial Prothero had repaid $1500 of the loan. He testified Jones first talked with him about the White City field after November 11, 1949.

I. The rules governing dealings between corporations and their officers and directors are well established. Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174, 216, points out that officers and directors of a corporation are trustees or quasi trustees of its property and occupy a fiduciary relation to it, that it may presume they will perform their duties with the diligence, honesty and utmost good faith, inherent and implicit in their functions, and is not required to be ever on guard to prevent loss of its assets by their misconduct. The decision continues: "Corporate directors and officers may under proper circumstances transact business with the corporation including the purchase or sale of property, but it must be done in the strictest good faith and with full disclosure of the facts to, and the consent of, all concerned. And the burden is upon them to establish their good faith, honesty

and fairness. Such transactions are scanned by the courts with skepticism and the closest scrutiny, and may be nullified on slight grounds. It is the policy of the courts to put such fiduciaries beyond the reach of temptation and the enticement of illicit profit. These principles are founded on the soundest morality and have received the clearest recognition in all courts [citing many authorities]."

■ Liken v. Shaffer, 8 Cir., Iowa, 141 F.2d 877, 879, 880, states: "That the officers and directors of a corporation occupy a fiduciary relation to the stockholders is, of course, well settled [citing authorities]. Their acts are accordingly 'subject to close scrutiny by the courts, and must be in the utmost good faith and fair.' Wabash R. Co. v. Iowa & S. W. R. Co., 200 Iowa 384, 202 N.W. 595, 599. Under Iowa law, officers and directors are not prohibited from purchasing property belonging to the corporation, but their actions will be examined in the light of their fiduciary responsibility, and the transaction may be set aside on slight grounds as being unfair in the relationship. See Hallam v. Indianola Hotel Co., 56 Iowa 178, 9 N.W. 111."

■ The decision holds the doctrine of unjust enrichment is applicable, stating: "Hence, as we have indicated, while the complaint charges that defendants have acted fraudulently, it also clearly states a cause of action cognizable in equity on the ground of violation of fiduciary relationship and duty by unjust enrichment, without regard to the existence of fraud either actual or by artificial theory. Fiduciary relationship in the nature of a trust—such as is the position of officers and directors with respect to corporate property—is as basic a ground of equitable jurisdiction as fraud itself. '* * * an element of trust * * * always confers jurisdiction in equity.' Oelrichs v. Spain, 82 U. S. 211, 228, 15 Wall. 211, 21 L. Ed. 43. 'The jurisdiction of a court of equity to interfere in all cases involving such an ingredient is too clear to require any citation of authorities. It rests upon an elementary principle of equity jurisprudence.' Morgan v. City and Town of Beloit, 74 U. S. 613, 619, 7 Wall. 613, 19 L. Ed. 203. The jurisdiction may be exercised to examine a fiduciary's purchase of any property connected with the trust relationship, and, among other things, to test the fairness and reasonableness

of the transaction and the result in the· light of the fiduciary relationship and duty. Restatement, Restitution, §§190, 191, 192. If an unjust enrichment exists on the basis of the fiduciary relationship and duty, equity may grant relief on that ground alone, without resort to its general jurisdiction over fraud. The fact that the evidence to show the inequitableness of the transaction or the unfairness of the result as a matter of fiduciary relationship and duty may also demonstrate the existence of fraud does not require that the court's jurisdiction be cast in the realm of fraud or that the action be classified as one 'for relief on the ground of fraud.' Cf. Tilton v. Bader, 181 Iowa 473, 164 N. W. 871, 873.''

The text in 13 Am. Jur., Corporations, section 1002, page 956, states: ''Actual injury is not the principle upon which the law proceeds in condemning such contracts. Fidelity in the agent is what is aimed at, and as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal. Although the contractors may, as members of the board, have acted honestly and solely with reference to the corporate interest, ·yet, if they have acted otherwise, they occupy a position which puts it in their power to conceal the evidence of the facts and to defy detection. If, therefore, such contracts were to be held valid until shown to be fraudulent or corrupt, the result, as a general rule, would be that they must be enforced in spite of fraud or corruption. There also enters into it the legal principle that in order to make an express contract, there must be the assent of two separate independent minds; that no man can effectually make a contract with himself.''

From the decisions listed in an extended annotation on ''Right of corporate officer to purchase corporate assets from corporation'', in 24 A. L. R.2d 71 to 112, it appears Des Moines Bank & Trust Company v. George M. Bechtel & Company, supra, 243 Iowa 1007, 1081, 51 N.W.2d 174, 216, and other decisions of this court are in accord with the great weight of authority. The author of the annotation states, at 24 A. L. R.2d 74, 75, it is well settled the corporation may always have the purchase of its property by an officer or director set aside, if the contract is un-

fair or entered into in bad faith by such officer or director; that in determining whether the contract is unfair the courts apply the test of closest scrutiny and require the director or officer to prove the good faith of the transaction and also its inherent fairness from the viewpoint of the corporation. The author states also that a factor mentioned in a number of decisions as bearing on the question of fairness is the disclosure by the purchaser to the other directors of all pertinent circumstances. "If the courts find that the officer has held back material information from his colleagues, they have little hesitation in finding bad faith or unfair dealing.

"Finally, the adequacy or inadequacy of the price paid by the purchasing officer for the corporate property constitutes an important factor in determining the fairness of the transaction. Thus, gross inadequacy of the price will, as a general rule, warrant a court of equity in setting aside the sale even though the director had been guilty of no actual fraud or fraudulent intent."

The text in 19 C. J. S., Corporations, page 138, section 775, states: "The courts will uphold the purchase when, and only when, it was fairly and openly made for an adequate consideration * * *."

II. We hold defendants have failed to discharge the burden, fixed by law, of establishing the good faith of the transaction and its inherent fairness from the standpoint of Atlas Coal company.

It will be remembered Atlas had been considering liquidating since 1948, and did, in 1949, dispose of its mining machinery and leases. Thereafter it ceased strip mining and limited its operations to buying coal mined by others, processing it through its tipple and plant and selling it. In March 1949 Berwick and Read had tried to interest a Chicago operator in buying Atlas Coal Company itself. Later Hollingsworth listed the White City contracts with a dealer who brought several outside operators to inspect the property. Berwick and Jones testified that during the four-month period from July 1 to November 1, 1949, they tried to dispose of the White City contracts to a majority of the mine operators in that district, some of whom were con-

tacted several times. They did not contact the several other operators.

Plaintiff found it necessary to use Berwick and Jones as witnesses. On cross-examination by his own counsel Berwick testified he contacted everyone he could think of or hear of who might be interested. "Q. Before November 16th, had you been told of any person that might be willing to remove any coal from this White City coal field? A. No."

Later, as a witness for defendants, Jones testified on direct and cross-examination concerning various named persons contacted with reference to the White City field. "I did not find anybody who would take over the field. * * * At that time I did not know of any person, anybody in the world, who could be induced to remove that coal. * * * Up to November 1, 1949, no one, any person, firm or corporation stated that he, she or it would take over these White City contracts on any kind of a basis." "I say that I reported to the Board all the efforts that I had made with all the operators. I reported all those. As far as I remember I told you of all the operators with whom I made contact. I say that I knew of nobody, of no operators who were willing to take over the White City coal field after January 1, 1949, up till November 1, 1949."

It then developed that Engnes Coal Company had called upon Berwick in Des Moines, in the spring of 1949. "We told him we had been prospecting and hadn't found anything and wanted to know if they would be interested in leasing out the White City coal field, subleasing the land." Berwick referred them to Jones. They saw Jones in Oskaloosa about a month later. They stated they had debts of about $78,000, had equipment worth about $100,000 and would need some financing (about $4000) to move to White City. Jones told them the White City contracts required the payment of a considerable sum of advance royalties. "He told us we were broke and that was the last of it." Neither Jones nor Berwick ever contacted Engnes about the White City field after July 1949. Thereafter Engnes Coal Company moved to a field near White City (without financing) and was there conducting strip mining operations at the time of the trial of this case in 1952 and, incidentally, had been selling coal to Atlas.

Berwick followed Jones as a witness for defendants. He had previously denied knowing of any person who might be willing to remove any coal from the White City field. When confronted with the Engnes Coal Company transaction he testified, "I knew that the directors wouldn't be interested in subleasing this land to someone who would get it all mixed up maybe a year later * * *. * * * The financial statement indicated they were rather hopelessly involved at that time." Berwick did not testify the Engnes application was ever reported to the Board of Directors. Jones testified, "It was reported to the Board" and that he did not mention Engnes in his direct examination because—"They did not come to me directly, they came through Mr. Berwick to me." Jones's testimony the Engnes offer was reported to the Board does not accord with his other testimony.

Nor was Engnes the only operator to whom the record indicates White City field might have been subleased by Atlas had full disclosure of the facts been made to the Board of Directors. Prior to November 1, 1949, Prothero was looking for a coal field for winter work. He inquired of Jones who showed him only some "odds and ends" in the original Atlas field. Prothero was not interested in them. Jones did not then inform Prothero of White City field and Prothero's inquiry for a coal field was not reported to the Board of Directors of Atlas. Had it been so reported Atlas would have had the opportunity to negotiate with Prothero through Berwick and Jones, and might have made a deal with him similar to the one Berwick and Jones later made with him for themselves.

In the contract of November 7, 1949, executed for Atlas by Berwick, Atlas assigned to Jones the four White City leases and also all its drill records and plats of the coal in the field. Jones agreed to pay $10 and to assume any liability of Atlas under the leases and hold Atlas harmless therefrom.

Defendants place considerable emphasis upon this assumption of liability. Although the inclusion of this provision in the contract was proper and desirable for Atlas, the burden assumed by Jones thereunder does not seem onerous. We have already noted the leases were favorable to Atlas and have set out the substance of the more important provisions. Mr. Read expressed

the opinion Atlas might be subject to liability only in case of failure to carry on mining after the same was started.

Plaintiffs contend the inclusion in the sale of the drill records and plats, which were subsequently resold by defendants to Prothero for $2500, was not authorized by Atlas. No such authorization appears in any record of the corporation or evidence herein. Defendants assert the drill records and plats were a part of the investment of Atlas in White City field and went with the contracts. We deem it unnecessary to determine this issue. In any event, the drill records and plats were included in the property of Atlas transferred by Berwick to Jones for the $10.

Defendants contend $10 was an adequate price for the White City field, drill records and plats. Berwick testified the field was of no practical value. Jones testified: "Q.What was the fair and reasonable market value? A. No value." The reasons given by Jones are the location of the field is so far from market it is too expensive to haul the coal; lack of highways and roads, and the coal is "very questionable." Jones's opinion of White City field must have changed radically. He "acquired or helped acquire the leases on the White City field * * * for Atlas Coal Company." Both Berwick and Jones were officers and directors of Atlas after it had made the tests shown in the drill records and plats, and while it was paying about $4000 annually for advance royalties. There is no suggestion either of them ever questioned the value of this field before 1949.

Another witness testified it was of no value because it was out of a market range. A fourth witness testified the White City contracts had no market value because of the location, depth of overburden, thickness of coal, etc. Although this opinion evidence is entitled to consideration, it comes into collision with facts against which it cannot prevail. The record shows Prothero was operating in White City field with success and apparently with profit. He marketed the coal at the Atlas tipple and the tipple of another coal company. The royalty rates in the White City leases at ten and fifteen cents per ton were low and Prothero's contract required him to pay twenty cents per ton

plus two cents of the first 75,000 tons for the balance of purchase price of drill records and plats.

As already stated Prothero paid defendants $13,695.16 to March 1, 1952. If, as the evidence at one place suggests, White City proves to be a 250,000-ton field the holder of the contract with Prothero should realize a net profit of more than $40,000. At another place the record suggests White City is a 500,000-ton field. In that case the net profit should approximate $60,000. The only substantial expenditure by Jones and Berwick or their White City Coal Company in the first two years of operation was made necessary by an attempt of the property owners to cancel the Lee contract. White City Coal Company brought suit and secured judgment establishing and protecting its lease or contract. This cost White City Coal Company $777.60. As already pointed out, the royalties advanced by White City Coal Company in the first few months, as well as the $20,600 advanced by Atlas, have been or should eventually be returned in the form of credits upon royalties. The record in this case requires the conclusion that the $10 consideration paid Atlas for the leases and drill records was grossly inadequate.

There are some other circumstances from which inferences casting suspicion upon the transaction may be drawn. One is that Jones and Berwick, who claimed they had long been unable to find an interested operator for Atlas, found such party and made a deal for themselves almost immediately after they acquired the contracts. Another is the disappearance from the files of Atlas, which had been in the custody of Jones, of correspondence and other papers relating to the transaction. In that connection it may be noted the minutes of meetings of directors and stockholders prepared by Jones and Berwick make little or no reference to other important transactions which witnesses testified were considered at such meetings but do contain much about this one. Another circumstance is the apparent attempt to conceal Berwick's participation in the transaction. On January 30, 1950, Berwick wrote a letter to a stockholder of Central Iowa Fuel Company, reporting at length on Atlas's operations and stating, "The White City leases were sold to Les [Jones] so we are relieved of any liability under them." At the

stockholders' meeting held May 8, 1950, Jones stated he had taken over the White City leases. He reported this to the Board also and stated Atlas was buying coal from the operator, so Atlas could stay in operation from that field.

Reference might be made to other facts and circumstances, some of which tend to support defendants' contentions. However, the record as a whole requires the finding, already noted, that defendants have not established by the requisite proof, the good faith and fairness of the transaction. This is contrary to the finding of the distinguished trial court.

██ ██ III. Defendants pleaded estoppel, ratification and laches. On the issue of estoppel they assert Atlas induced Jones to take over the White City leases by telling him any profit would be his, that he was skeptical about this but considered the possibility something might develop which would make the venture profitable, and, relying upon the assurances made him by the Atlas governing body, he entered into the contract to protect Atlas, which might have led to financial disaster, and parted with a substantial sum of money to pay delinquent advance royalties. Goodwin Tile & Brick Co. v. DeVries, 234 Iowa 566, 568, 13 N.W.2d 310, 312, 155 A. L. R. 346, 348, states:

"The essential elements of equitable estoppel, or estoppel in pais, have been listed as false representation or concealment of material facts, made to one without knowledge of the real facts, with the intention that it be acted upon; and reliance thereon by the party to whom made, to his prejudice and injury [citing authority]."

The decision states each element should be proven convincingly and satisfactorily. Here there was no such proof of the various elements of estoppel. The record does not show Atlas induced Jones to take over the leases or that Atlas told him anything about them or gave him any assurances. Nor does it show reliance by any defendant on any assurances or conduct of plaintiff. Defendants' contention at this point is largely a repetition of their argument on the issue of their good faith and the inherent fairness to Atlas of the transaction. It assumes defendants rightfully secured and held the leases and drill records. That issue

has already been decided against defendants. Their plea of estoppel is not meritorious.

IV. Defendants contend the stockholders and directors of Atlas ratified the sale of the leases. They say Atlas's books show the consummation of the transaction. On this point Jones testified: "Page 111 of Exhibit 24 shows an entry of $10.00 under the heading 'Advance Royalty' on the White City Field." The entry is from cash book 169 or 168. Later on, December 31st, a loss of $21,139 was charged off on a journal entry on page 591. Page 121a in Exhibit 24 shows a journal entry on December 31, 1949, from page 159, charging off $3296.24 drilling costs under the heading "Drilling Tract Number 3, White City, Iowa." Jones testified also that monthly statements were distributed: "The statement for October shows the White City property as an asset of the corporation. It is shown as advance royalties account and drilling costs of White City. The November statement Exhibit 4b, shows a deduction of $10.00. The monthly financial statement for December, 1949, shows the entire elimination of the White City assets."

The act mainly relied upon by defendants as ratifying their purchase of the White City contracts was the adoption of the following motion at the 1950 stockholders' meeting:

"RESOLVED that all actions of the officers and directors during the past corporate year shall be ratified, approved and confirmed."

With reference to such a resolution Camden Land Co. v. Lewis, 101 Maine 78, 102, 63 A. 523, 532, 533, states: "* * * The burden is on him who relies upon a ratification to show that it was a binding ratification—that is to say, that it was made with a full knowledge of all the material facts [citations]. The resolution of ratification was both broad and indefinite. No single act is referred to. * * * Nor is knowledge to be presumed from the fact that the transactions appeared in the records and books of the corporation. Means of knowledge is not knowledge in such case."

Hyams v. Old Dominion Co., 113 Maine 294, 300, 93 A. 747, 749, 750, L. R. A. 1915D 1128, stated the resolutions were sweeping and referred to no particular act and it did not appear the stockholders knew what had been done: "* * * Such a rati-

fication is ineffective because it really does not ratify. It is a paper ratification, not a real one. A decent respect for the rights of stockholders, especially of minority stockholders, should require that he who seeks to bind them by votes of ratification should show that the stockholders generally knew specifically what they were voting about."

Melgard v. Moscow Idaho Seed Co., 73 Idaho 265, 273, 251 P.2d 546, 551, states: "* * * Such ratification, as a matter of course, is limited to proper official acts of the directors and officers and cannot be regarded as an approval of extra-official acts, and especially such acts as are unknown to the stockholders at the time [citations]. Where the agent's personal interests are in conflict with those of his principal, and where his personal interests might be jeopardized by a full disclosure to the principal, the presumption is that the principal does not have knowledge of such acts."

Lutherland, Inc. v. Dahlen, 357 Pa. 143, 154, 53 A.2d 143, 148, holds: "To the reliance placed by Dahlen on the various resolutions of the shareholders ratifying the acts of the officers and directors the conclusive answer is that Dahlen never made, to either directors or shareholders, a full and frank disclosure of what he and Scherer had done and without such a disclosure any such ratification is of no binding force."

In the case at bar there is no evidence the other directors and stockholders knew the contents of the books of account. There is evidence various stockholders and directors either had not seen or had not been given the opportunity to examine the statements prepared by Jones and most of them did not know much about the sale of the White City leases or that Berwick who had represented Atlas in the sale was interested in the purchase also. The record does not show defendants ever made, to the directors or stockholders of Atlas, a full and frank disclosure of all matters connected with the White City transaction. We hold defendants have failed to prove ratification.

█ V. The defense of laches was not established. August 21, 1951, Atlas demanded that defendants transfer to it the White City leases and the Prothero lease and account for the receipts thereunder. Atlas offered to repay the $10 purchase

price and any amounts paid under the requirements of the White City leases. This suit was started shortly thereafter.

Schmidt v. Schurke, 238 Iowa 121, 126, 25 N.W.2d 876, 877, 879, thus states the elements of laches, in part: "* * * (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit; * * * (4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is not held to be barred."

Defendants did not prove either of these elements. In fact, the record affirmatively points to the contrary.

The judgment of the district court is reversed and the case is remanded for further proceedings in harmony herewith.— Reversed and remanded.

All JUSTICES concur.