LAWRENCE WAREHOUSE COMPANY, a Corporation, Plaintiff,

v.

A. R. MENARY, Harvey C. Moeller, A. A. Mead and R. B. Mead, Defendants.

No. 1–163.

United States District Court
S. D. Iowa, Davenport Division.

Sept. 14, 1956.

Charles O. Butler, Chicago, Ill., and Walter A. Newport, Jr., Davenport, Iowa, for plaintiff.

Carl H. Lambach and Margaret Stevenson, Davenport, Iowa, for defendants Harvey C. Moeller, R. B. Mead and A. A. Mead.

B. D. Silliman, Cedar Rapids, Iowa, for defendant Thomas Orr Menary, administrator of the estate of A. R. Menary, deceased.

DAVIES, District Judge.

This is a civil action against two sets of guarantors to recover $25,736.99 represented by three promissory notes given by the principal obligor to a creditor bank, which assigned the guaranty contracts and notes to the plaintiff.

This amount was made the subject of two separate and independent claims, one against A. R. Menary and Harvey C. Moeller as guarantors under an agreement made June 23, 1952, and the other against R. B. Mead and A. A. Mead under an agreement made June 16, 1952. The guaranty agreements were executed as additional security devices in financing the business operations of Mid-States Packing Company, Inc., a meat-packing plant in Milan, Illinois, working within the field warehousing system of the plaintiff Lawrence Warehouse Company, a California corporation.[1]

R. B. Mead was president of Mid-States, and the secretary was his daughter-in-law, A. A. Mead; his son and her husband, Everctt Mead, was manager of

---

1. For a good general description of field storage warehousing, see Restatement, Security (1941), Sec. 11, comment *d*, pp. 42–44.

the company. A. R. Menary was a veterinary doctor who had invested in and was employed by Mid-States, and Harvey C. Moeller was a farmer whom Menary persuaded to join in making one of the guarantees. Moeller was not an investor but was interested in the success of Mid-States since he had sold cattle to the company in consideration of a note for $14,786.38 given him by Menary.

Mid-States bought and slaughtered livestock and stored the meat in the warehouse part of its own plant, which was under the exclusive supervision and control of Earl E. Ostrander as agent for the plaintiff. With nonnegotiable warehouse receipts of the plaintiff issued by Ostrander for such meat, Mid-States obtained money on credit from First National Bank of Rock Island, Illinois, executing company notes and pledging the warehouse receipts to the bank as security. Under this arrangement the plaintiff was required to store all meat covered by receipts until the bank gave its written authorization to release the meat for sale by Mid-States.

Ordinarily the bank would regard itself as secure by advancing credit to the extent of 90% of the value of meat under warehouse receipts. But because Mid-States had been having refrigeration troubles resulting in some loss by spoilage, the bank demanded additional security by way of guarantees from responsible persons interested in the company. At the request of Ostrander who was handling the company's financial operations, the defendants R. B. Mead and A. A. Mead signed their guaranty, containing a $50,000 liability limit, on the understanding known to the bank that a similar guaranty would be made by the other two defendants.

The guaranty signed by Menary and Moeller involved rather complicated negotiations with Everett Mead and Earl Ostrander, and later between Menary and two officers of the bank, Lewis Wilson and George C. Trauten. Menary and Moeller wanted to limit the guaranty to the risk of spoilage, as to which they felt loss was quite unlikely in view of recent refrigeration improvements. But Ostrander insisted that they use blank forms of unconditional guaranty furnished by the bank. Menary and Moeller acceded to this request provided that most of the printed language was stricken and the following language inserted: "This guaranty is limited entirely to Mid-States Packing Co., Inc., notes issued in support of Lawrence Warehouse Company warehouse receipts." Such language was typed in, and Moeller signed the instrument, relying on Menary's promise to see that the guaranty was limited by striking the unwanted general provisions. Menary later visited the bank with Ostrander, and was persuaded by the bank officers to agree to substitution of the words "secured by" for the words "issued in support of," contained in the added clause. Menary put his okay and initials by the change and signed the instrument without having the printed provisions stricken. This alteration, along with the insertion of "$100,000" as liability limit, was made in the presence and with the knowledge of Ostrander.

The present action was precipitated by the following events: On the basis of a check to Mid-States from a buyer of meat, brought by Everett Mead from Chicago to Milan on July 30, 1952, Ostrander released a load of 62 beef carcasses without the required authorization of the bank. The next day this load was hijacked in Chicago. The buyer stopped payment of the check, and as a consequence Mid-States could not pay the notes held by the bank. To avoid liability to the bank on the warehouse receipts, plaintiff paid the notes and received from the bank an assignment of the notes and the two guaranty contracts.

In a pretrial order of this Court on September 1, 1954, it was determined that the value of the hijacked load of meat was $28,002.50, and that the plaintiff had recovered from insurance the sum of $12,000 by which the amount of its claim in the present action would be reduced. Inasmuch as the operative facts which are the subject of this action occurred in Illinois, the law

of that state is controlling. Twohig v. Lawrence Warehouse Co., D.C.Iowa 1954, 118 F.Supp. 322, 328; see, in general, Goodrich, Conflict of Laws (3rd ed. 1949), pp. 260–262 (tort liability), and 321–323 (contract liability). Under Illinois law plaintiff, as warehouseman, committed a conversion of the 62 carcasses by releasing them without authority from the bank. Ill.Ann.Stat. Smith-Hurd, c. 114, § 242, 3 U.L.A., Uniform Warehouse Receipts Act, Sec. 10; Sugar Supply Corporation v. Great Lakes Transit Corporation, 1933, 272 Ill.App. 129; Restatement, Torts (1934), Sec. 235(1), pp. 602–603.

The ultimate issue in this case is whether a warehouseman, wrongfully releasing and making possible the theft of goods covered by warehouse receipts pledged to a bank as security for promissory notes also secured by guarantees, can by paying the notes and receiving an assignment from the bank recover from guarantors the amount paid.

■ It is the opinion of this Court that the warehouseman cannot recover from the guarantors under such assignment. The plaintiff certainly cannot recover from the defendant Moeller because material alteration of the guaranty agreement without his consent (increasing the risk by substitution, insertion, and non-deletion of terms) discharged him from liability. Despres v. Folz, 1907, 134 Ill.App. 111; see, in general, Restatement, Contracts (1932), Secs. 434 and 435; Simpson, Suretyship (1950), Sec. 72, pp. 329–351. And the plaintiff cannot recover from the defendant Menary because the guaranty as signed by him was applicable only to notes of Mid-States secured by warehouse receipts of the plaintiff, and Menary was discharged from liability when the notes were no longer so secured as a consequence of the plaintiff's own wrongdoing.[2] Finally, the plaintiff cannot recover from the defendants Mead because a condition precedent to the effectiveness of their guaranty—that a similar guaranty be obtained from Moeller and Menary—was never fulfilled. Restatement, Security (1941), Sec. 102(1); Restatement, Contracts (1932), Sec. 241.

■ The guarantors, although respectively entitled to rely upon these particular defenses, are further protected from liability on the fundamental general ground of public policy that a right of action cannot be based upon a wrongful act of the plaintiff. Kessinger v. Standard Oil Co., 1925, 245 Ill.App. 376; McClintock, Equity (2d ed. 1948), 59–61. The claim of the plaintiff is a direct outgrowth of its conversion of the 62 beef carcasses. As a wrongdoer the plaintiff would have standing neither in equity because of unclean hands, nor at law because of the rule *ex turpi causa non oritur actio*: from a wrongful cause an action cannot arise. Workingmen's Banking Co. v. Rautenberg, 1882, 103 Ill. 460; cf. Bishop v. American Preservers' Co., C.C.Ill.1900, 105 F. 847 (pari delicto). Accordingly, plaintiff cannot take advantage of an assignment of rights given for satisfying its own legal liability arising from commission of the wrong. Southern Pac. Co. v. Bank of America, D.C.Ill.1928, 23 F.2d 939, affirmed 7 Cir., 1928, 29 F.2d 465. The right of action born of this wrong is spurious and without legal status.

■ Moreover, by assignment plaintiff acquired no rights under the guarantees. One reason is that the guarantees did not contemplate or comprehend the risk of loss by conversion on the part of the warehouseman; such risk was wholly outside their scope and application. Manufacturers Trading Corporation v. Harding, 7 Cir., 1950, 181 F.2d 609; Second Nat. Bank v. Diefendorf, 1878, 90 Ill. 396. Another reason is that the liability of the guarantors was discharged upon payment of the notes by the plaintiff. The guarantees involved a tripar-

2. The liability of a guarantor is limited strictly to the terms of the guaranty. Shreffler v. Nadelhoffer, 1890, 133 Ill. 536, 25 N.E. 630; see Restatement, Security (1941), Sec. 88.

tite relationship as to one obligation: the bank as creditor entitled to one performance of the obligation represented by the notes, Mid-States as principal obligor on the notes, and the defendants as guarantors bound to pay the notes on default of the principal. See Restatement, Security (1941), Sec. 82.

Also securing the same obligation on these notes were the nonnegotiable warehouse receipts issued by plaintiff and held by the bank. While the bank could have asserted claims against Mid-States on the notes, against the defendants on the guarantees, or against plaintiff as independent obligor on the warehouse receipts, it was entitled to but one satisfaction of the obligation. Appropriately it received that satisfaction from the plaintiff, the party most at fault in making the loss by theft possible. This satisfaction by the plaintiff as real obligor was an extinguishment of the obligation. Pearce v. Bryant Coal Co., 1887, 121 Ill. 590, 13 N.E. 561; Restatement, Contracts (1932), Sec. 451; cf. Grand Council of Pennsylvania, Royal Arcanum v. Cornelius, 1901, 198 Pa. 46, 47 A. 1124. The plaintiff did not purchase the notes and get an assignment of the guarantees as a voluntary business venture to acquire a sound asset, but as an involuntary business undertaking to settle a liability. The guaranteed notes having been paid rather than purchased by plaintiff, the notes and the guarantees were thereby satisfied, and the assignment did not revive them. Gill v. Waterhouse, 9 Cir., 1917, 245 F. 75; accord, Day v. Humphrey, 1875, 79 Ill. 452.

Even in the event the assignment were regarded as effective, recovery on the guarantees would be denied plaintiff to prevent gain from its own wrongdoing if the defendants had no other defense, or to avoid circuity of action if they did have defensive rights against plaintiff. Arguably, plaintiff has already been unjustly enriched by being able to pay just $25,736.99 to settle its liability of $28,002.50 for the value of the beef converted, and by recovering $12,000 insurance on the resultant loss. Lawrence Warehouse Company v. Twohig, 8 Cir., 1955, 224 F.2d 493. Plaintiff has thus dispersed $14,265.51 of the liability arising from its conversion, and it would be inequitable to permit total escape from liability for such wrong. Apart from equitable considerations, however, it would be improper to give judicial recognition to a right based upon this wrong, assuming the defendants had defensive rights of their own. Liability upon the guarantors could not be imposed without giving them by subrogation whatever rights the plaintiff had (strictly as an assignee) against the wrongdoer (itself as warehouseman) for conversion. Bartel v. Zimmerman, 1920, 293 Ill. 154, 127 N.E. 373; see, in general, Restatement, Security (1941), Sec. 141; Simpson, Suretyship (1950), Sec. 47, pp. 205–223. Of course, if the assignment from the bank to the plaintiff destroyed or neutralized such rights, defendants were discharged from liability by this impairment of a security at least as valuable as the obligation. Kirkpatrick v. Howk, 1875, 80 Ill. 122; see, in general, Restatement, Security (1941), Sec. 132; Simpson, Suretyship (1950), Sec. 74, pp. 370–375. But if the assignment did not destroy these rights, it would be necessary to hold, first, that plaintiff could recover from the defendants as assignee and, second, that the defendants could recover back from the plaintiff as subrogees to the assignee's rights against itself. No court should countenance such circuity. Maryland Cas. Co. v. Employers Mut. Liability Ins. Co., 2 Cir., 1953, 208 F.2d 731.

Consequently, upon the particular grounds protecting the respective defendants and upon the general ground that plaintiff as wrongdoer cannot take advantage of an assignment of rights given for satisfying its own legal liability for the wrong, plaintiff is not entitled to recover on the guarantees and defendants are entitled to judgment dismissing the action with prejudice and for their costs herein to be fixed and assessed by the Clerk of this Court.

888

Mr. Carl H. Lambach and Miss Margaret Stevenson, attorneys for certain of the defendants, will prepare findings of fact, conclusions of law, order for judgment and judgment in conformance herewith and submit them through the Clerk of this Court with the least practicable delay.

It is so ordered.