**TWOHIG et al.**

v.

**LAWRENCE WAREHOUSE CO.**

Civ. No. 742.

United States District Court
N. D. Iowa, W. D.

Jan. 16, 1954.

Charles F. Stilwill and Kenneth T. Wilson (of Stilwill, Brackney, Stilwill & Wilson), Sioux City, Iowa, for plaintiffs.

Charles O. Butler, Chicago, Ill., Maynard Garrison (of Wallace, Garrison, Norton & Ray), San Francisco, Cal., and Harry H. Miller (of Sifford & Wadden), Sioux City, Iowa, for defendant.

GRAVEN, District Judge.

The plaintiffs all citizens of the State of Iowa, are copartners in a livestock commission house buying and selling livestock on the Sioux City market under the partnership name of Wagner, Garrison & Abbott. They will hereinafter be referred to by their firm name or as plaintiff. The defendant, Lawrence Warehouse Co., Inc., a California corporation, hereinafter referred to as Lawrence or defendant, is engaged in the warehousing business on a nation-wide basis and was amenable to service of process within the Northern District of Iowa.

In substance plaintiff's complaint in three counts alleged: (1) conversion by defendant of 100 beef carcasses; (2) wrongful appropriation by defendant of those same 100 carcasses; (3) appropriation by defendant of those same 100 carcasses from or with the "Mid States Packing Co." with knowledge of plaintiff's beneficial interest in the carcasses. Plaintiff prayed for judgment in the sum of $21,789.39, or for restitutionary remedies by way of an accounting and constructive trust.

Prior to March 17, 1952, defendant entered into an arrangement with the Mid States Packing Co., Inc., a corporation hereinafter referred to as Mid States, operating a meat packing plant at Milan, Illinois, a town near Rock Island, Illinois. Under the arrangement the defendant, under a lease from Mid States, operated a cooler area of Mid States' Milan plant as a bonded warehouse, issuing non-negotiable warehouse receipts on carcasses deposited by Mid States in the cooler. These warehouse receipts were issued to the First National Bank of Rock Island, Rock Island, Illinois, hereinafter referred to as the Bank, and held by it as collateral on its loans to Mid States. Except in the case of sales to Jewel Food Stores the defendant was authorized to release carcasses from the cooler for sale by Mid States only upon execution by the Bank of an "Order for Warehouse Release." Defendant engaged E. E. Ostrander, hereinafter referred to as Ostrander, as Warehouse Manager at Milan. With defendant's knowledge and consent Ostrander was also employed by

Mid States as record keeper and financial agent. He was thoroughly familiar with the entire pattern of operation at Milan and he was repeatedly instructed as to defendant's duty to the Bank under its warehouse receipts.

On March 17, 1952, Mid States and plaintiff entered into an agreement at Sioux City, Iowa, under which plaintiff became a purchasing agent for Mid States. The pertinent provision of this agreement was that plaintiff would purchase cattle for Mid States on the Sioux City market on a commission basis. The plaintiff was to advance the purchase price and be reimbursed for the purchase price and expenses and commissions by drawing drafts on Mid States and forwarding the drafts through regular banking channels for collection at the Rock Island Bank. Cattle so purchased were shipped immediately to Mid States at Milan. They were insured in the name of Mid States. The drafts for such cattle required 3 or 4 days to clear through Chicago and arrive at Rock Island. The practical effect of the Milan arrangements and the purchasing agreement between Mid States and plaintiff was that cattle shipped by plaintiff could be processed, warehoused, and loans obtained from the Rock Island Bank on warehouse receipts representing the carcasses of those cattle before plaintiff's drafts arrived for collection. Defendant through Ostrander had full knowledge of this arrangement.

Shortly after March 17, 1952, plaintiff requested written assurances from Mid States that drafts sent pursuant to the agreement would be honored. In response to this request plaintiff received the following letter:

"Mid States Packing Company
Milan, Illinois
April 7 1952
"Mr. D. A. Nordstrom
Wagner Garrison and Abbott
Sioux City Iowa
"Gentlemen:
"We have today advised the First National Bank of Rock Island Rock Island Illinois as follows; (Mid-States Packing Co., Inc. will accept and pay any and all Drafts sent your Bank for collection which are drawn for the the the payment of cattle by R. B. Mead and Wagner Garrison and Abbott. Will you please advise Mr. D. A. Nordstrom of Wagner Garrisn and Abbott Sioux City Iowa of the Content of this letter, thus clerraring the way for regular Bank Draft service)
"We expect that a letter of advice will reach you this week
"Thank You,
"Very truly yours,
Mid* States Packing Co., Inc.
by /s/ E. E. Ostrander

E. E. Ostrander"

Ostrander signed this letter in his capacity as an employee of Mid States. Plaintiff did not learn of his dual employment or of any of the warehousing and credit arrangements at Milan until after August 4, 1952. From March 17 to July 29, 1952, plaintiff made 39 purchases and shipments under this agreement and in each instance its drafts were paid.

On the evening of July 30, 1952, Ostrander, acting as defendant's warehouse manager, permitted the removal of 62 carcasses from the cooler for shipment to a purchaser without the surrender of the warehouse receipts covering them. The warehouse receipts for those carcasses were held by the Bank as collateral for loans by it to Mid States. No release from the Bank was ever obtained as to those carcasses. That night or the next day those carcasses were hijacked in Chicago and the purchaser stopped payment on the check given for the purchase price. Mid States did not have sufficient resources to pay its debt to the Bank for which these hijacked carcasses were the pledged security. After the hijacking the Bank refused further loans to Mid States with defendant's warehouse receipts as collateral.

Meanwhile plaintiff had made purchases for Mid States of 50 head of cat-

tle on July 29 and 50 head on July 30, 1952, and sometime during the period from July 30 to August 1, 1952, these cattle were processed and 100 carcasses came into the cooler at Milan, but no warehouse receipts were ever issued on them. Defendant and Mid States knew that drafts for the purchase price of these cattle were then en route from Sioux City and knew that under Mid States' existing financial situation the plaintiff could not be reimbursed for the purchase price unless the proceeds from the 100 carcasses were made available therefor.

Under these circumstances Ostrander prepared false Orders for Warehouse Release and joined with Mid States in the disposition of these 100 carcasses to third party innocent purchasers for value. The false Orders for Warehouse Release effected the substitution of these 100 carcasses under prior outstanding warehouse receipts, including those covering the 62 hijacked carcasses. This substitution effected the complete release of those receipts by the Bank. The drafts for the purchase of these cattle, totalling $30,089.94, were dishonored on August 4, 1952. Subsequently the plaintiff received $8,300.55 from Mid States and its loss stands at $21,789.39. It is to be noted that the total benefit to be received by the plaintiff from the transaction involving the 100 head of cattle was the sum of $103.50 in commissions.

There was a large amount of documentary and other evidence introduced. Detailed Findings of Fact have been made and filed herein. The parties in their briefs discussed the law in a great many fields. However, it would seem that the pertinent facts and applicable law may be rather briefly stated.

 The act of the defendant's manager in allowing 62 carcasses to be taken out of its warehouse without the authorization of the holder of the warehouse receipts covering them resulted in the defendant being short those carcasses when they were hijacked. Mid States was liable to the Bank for the loan by the Bank upon the warehouse receipts covering those carcasses. The defendant was liable to the Bank for the value of the 62 carcasses covered by those receipts. Mid States was insolvent. The defendant and Mid States, acting in cooperation, appropriated 62 carcasses of the cattle in question to make good the shortage on the receipts referred to. The defendant became a transferee without value and with notice of the 62 carcasses of the cattle in question. As a result of their appropriation by the defendant, it received the benefit of the 62 carcasses which were of the value of $19,237.36.

 It seems clear that the relation between the plaintiff and Mid States was that of principal and agent. All of the incidents of their relationship are indicative of that legal status. The plaintiff's commission was on a head basis. The amount the plaintiff was to receive was not dependent upon the value of the particular cattle involved, or their market price. Owners do not receive commissions; agents do. It was heretofore noted that under the arrangements between the plaintiff and Mid States the plaintiff took out transit insurance on the cattle. In that insurance the plaintiff listed the defendant as the owner. The cattle involved were delivered by the truckers hauling them on the receipt of Mid States only. No bills of lading or similar devices were made use of or contemplated by the plaintiff as a means of retaining or exercising dominion over the cattle. It was contemplated by the parties in their arrangements and followed in practice that after delivery of the cattle full dominion over them was in Mid States. The relation between principal and agent is a fiduciary relation. 2 C.J.S., Agency, § 1, p. 1023; Trice v. Comstock, 8 Cir., 1903, 121 F. 620, 626, 61 L.R.A. 176. It is one of trust and confidence. 2 C.J.S., Agency, § 1, p. 1024. The relation of principal and agent is one upon which the law imposes the requirement of fidelity and faithful-

ness. Trice v. Comstock, supra, 121 F. at page 623. A principal is under the obligation to deal fairly and in good faith with his agent. 3 C.J.S., Agency, § 174, p. 64. It is the duty of the principal to reimburse his agent for money advanced by the agent for the purchase of property in his behalf. 2 Am.Jur., pp. 231, 232; 3 C.J.S., Agency, § 197, p. 102.

While the overwhelming number of cases having to do with the fiduciary relationship between principals and agents involve the acts and conduct of agents, the duties and obligations imposed upon that relationship are not unilateral in character. The fiduciary relation between a principal and his agent is not a one-way legal street.

■ It seems clear that Mid States, as principal, stood in a fiduciary relation to the plaintiff, its purchasing agent, and it was subject to the duties and obligations of a fiduciary. It was unknown to the plaintiff that Mid States was operating on a basis under which the plaintiff was being reimbursed in each transaction from the proceeds of the very cattle shipped rather than from any independent resources of Mid States. It was known to Mid States that if the 100 head of cattle in question were appropriated towards the liquidation of pre-existing obligations the plaintiff could not be reimbursed for the cattle. With full knowledge of that situation, Mid States appropriated the cattle for the liquidation of such other obligations. A party is presumed to intend the nature of his acts. Therefore, it must be presumed that it was the intent of Mid States to appropriate the cattle without paying their purchase price. Even in situations where no fiduciary relation exists acceptance of goods with the intention not to pay for them constitutes fraudulent conduct. 77 C.J.S., Sales, § 50, p. 686. The conduct of Mid States violated the duties and obligations owed by it to the plaintiff as its fiduciary. It constituted a betrayal of fiducial trust and confidence. Its conduct must also be characterized as fraudulent. The defendant, with full knowledge of the situation, cooperated and colluded with Mid States in its violation of its duty as a fiduciary, in its betrayal of fiducial trust and confidence, and in its fraudulent conduct.

■ In Count I of its complaint the plaintiff seeks to recover on the theory of conversion. However, the plaintiff had neither title nor possession at the time of the wrong complained of. It seems clear that the plaintiff cannot recover on the theory of conversion. In Counts II and III of its complaint the plaintiff seeks to recover on the theory that the defendant was and is under the duty to make restitution of the benefit received.

■ In Restatement of Restitution, Sec. 138(2), it is stated: "A third person who has colluded with a fiduciary in committing a breach of duty, and who obtained a benefit therefrom, is under a duty of restitution to the beneficiary." In the briefs the matter of conflict of laws is discussed. It is the view of the Court that the wrong in question was committed in the State of Illinois and that the Illinois law is applicable. The parties have made no showing nor has search on the part of the Court indicated that the law of Illinois is not in accord with the Restatement Rule above set forth. It appears that the Illinois decisions are in accord with the general principles of equity relating to restitution. See Giese v. Terry, 1943, 382 Ill. 34, 46 N.E.2d 90; Harmony Way Bridge Co. v. Leathers, 1933, 353 Ill. 378, 187 N.E. 432; Miller v. Miller, 1915, 266 Ill. 522, 107 N.E. 821; Kern v. Beatty, 1915, 267 Ill. 127, 107 N.E. 794; Stahl v. Stahl, 1905, 214 Ill. 131, 73 N.E. 319, 68 L.R.A. 617; Pope v. Dapray, 1898, 176 Ill. 478, 52 N.E. 58. Judge Goodrich, speaking for the United States Court of Appeals for the Third Circuit, has stated, " * * But in the absence of direct local authority it seems to us proper to rely upon the Restatement of the Law as evidence of the law of the State. * * *" Venuto v. Robinson, 3 Cir., 1941, 118 F.2d 679, 682. See also Trowbridge v. Abrasive Co., 3 Cir., 1951, 190 F.2d 825, 828,

"\* \* \* This court has held, however, that the doctrine of that case has been so widely accepted that it has now become a part of the general law of torts. It has found expression in Section 395 of the Restatement of the Law of Torts. Hence, in the absence of any decisions to the contrary, we assume it to be the law of Oregon \* \* \*."; and Pierce v. Ford Motor Co., 4 Cir., 1951, 190 F.2d 910, 915. It is the belief of the Court that the Iowa law is also in accord with the Restatement Rule. See Eliason v. Stephens, 1933, 216 Iowa 601, 246 N.W. 771, 774, "\* \* \* equity will construct a trust where one, through actual fraud, abuse of confidence, or questionable means, gains something which in equity and good conscience he should not be permitted to hold." See also Liken v. Shaffer, 8 Cir., 1944, 141 F.2d 877, 880, "\* \* \* it (the complaint) also clearly states a cause of action cognizable in equity on the ground of violation of fiduciary relationship and duty by unjust enrichment \* \* \*," and, "If an unjust enrichment exists on the basis of the fiduciary relationship and duty, equity may grant relief on that ground alone \* \* \*." These statements from Liken v. Shaffer are quoted approvingly by the Supreme Court of Iowa in Atlas Coal Co. v. Jones, Iowa 1953, 61 N.W.2d 663, 668. See also Barnes v. Thuet, 1902, 116 Iowa 359, 89 N.W. 1085.

 The Court is of the view that the statement quoted above from Section 138(2) of the Restatement of Restitution sets forth the substantive rule of law applicable to this case. In this connection it may be noted that restitution may often be had from an *innocent* transferee who is not a purchaser for value. See article by Scott, Restitution From An Innocent Transferee Who Is Not a Purchaser For Value, 62 Harvard Law Rev. 1002 (1949), especially pp. 1002, 1007, 1011, 1014.

 It is clear that the defendant is chargeable with Ostrander's knowledge in the transactions relative to this case. Ostrander, as manager of de-

fendant's Milan warehouse, was clothed with authority to receive carcasses for deposit, issue warehouse receipts, prepare documents relative to the release of carcasses, and release carcasses from the warehouse area. Defendant's whole position is based upon an affirmance of Ostrander's disposition of these 100 carcasses, and therefore defendant could not and does not contend that it is not chargeable with whatever knowledge Ostrander had. The facts show that defendant knowingly colluded with Mid States in a breach of the duty owed by Mid States to plaintiff and in the betrayal of fiducial trust and confidence on the part of Mid States and without parting with value of any kind substituted 62 of these 100 carcasses to cover outstanding warehouse receipts held by the Bank which were originally issued on the 62 carcasses which were hijacked. Therefore, the defendant, in concert with plaintiff's principal, Mid States, unjustly enriched itself at plaintiff's expense to the extent of 62 carcasses. Those carcasses were of the value of $19,237.36.

It is not in accord with the policy of the law to allow a party to enrich itself by participation in a betrayal of fiducial trust and confidence.

 Plaintiff's loss now stands at $21,789.39. As against Mid States or in an action for conversion this amount would be plaintiff's measure of recovery. But plaintiff's recovery from Lawrence is founded on principles of restitution. Under principles of restitution the measure of recovery against a nontortious transferee is the amount by which the transferee has unjustly enriched itself at plaintiff's expense. Restatement of Restitution, Section 155(1). However, if the defendant has acquired, retained, or disposed of plaintiff's property by fraud or consciously tortious conduct, the measure of recovery is the value of the property at the time of its improper acquisition, retention, or disposition. Restatement of Restitution, Section 151. Comment (a) to that section of the Restatement explains, "\* \* \* It (the

rule) applies where a subsequent transferee of things obtained by fraud or duress either participated in the original wrongful conduct, or knew of the facts before receiving or disposing of the subject matter. * * * "

It appears quite clearly and satisfactorily that defendant has unjustly enriched itself to the extent of $19,237.36 by its substitution of carcasses shipped by the plaintiff under warehouse receipts on which it was short 62 carcasses. As to those 62 carcasses the measure of plaintiff's recovery would be the same under either Section 151 or Section 155 (1).

It has been held that in restitution cases the defendant's gain, not the plaintiff's loss, is the measure of recovery. Trevor v. Fuhrmann, 1953, 338 Mich. 219, 61 N.W.2d 49. However, the rule set forth in Section 151 of the Restatement of Restitution goes further and in substance would permit recovery to be measured as in cases of conversion if the defendant acquired, retained, or disposed of plaintiff's property by fraud or consciously tortious conduct. The quoted comment appended to that statement in the Restatement refers to a "subsequent *transferee.*" (Emphasis added.)

 In restitution cases the burden is upon the party seeking restitution to clearly and satisfactorily establish his right to restitution. To warrant the imposition of a duty to make restitution by constructive trust or otherwise because of betrayal of fiducial confidence there must be clear and satisfactory evidence that a fiduciary relationship existed, that it was breached, and that as a consequence of the breach the defendant was enriched. Young v. Bradley, 6 Cir., 1944, 142 F.2d 658, 660. The plaintiff has clearly and satisfactorily established its right to restitution as to the 62 carcasses. The plaintiff has not so established its right to restitution as to the 38 carcasses. As to the 38 carcasses there is no clear and satisfactory showing that the defendant was a "subsequent trans-

feree" or that the defendant was enriched by its connection with them. So far as the record shows, the defendant may have been no more than a conduit. The defendant was and is under the duty to make restitution to the plaintiff for the 62 carcasses of the value of $19,237.-36, the amount of its enrichment.

 The plaintiff is further entitled to the interest on the sum of $19,237.36 from August 28, 1952, the date its receipt of the benefit was completed. In Restatement of Restitution, Section 156 (b), it is stated that a person liable to make restitution is also under a duty to pay interest from the time he committed a "breach of duty" in failing to make restitution. In comment (a) to that same section, it is stated that a person is considered to have committed a "breach of duty" from the time such person has been "tortious or otherwise at fault." The defendant having been "at fault" from the beginning, it "committed a breach of duty in failing to make restitution" at the time the transaction was completed. See also Smith v. Dravo Corp., 7 Cir., 1953, 208 F.2d 388, 391.

 Where a party is entitled to restitution, there are a number of remedies made use of by the Courts to effect restitution. In Restatement of Restitution, Section 4, entitled "Remedies," there are set forth at least six ways by means of which a Court may effect restitution. It is stated in that section that, among other ways, a Court may enter a judgment at law or a decree in equity for the payment of money. In the present case the carcasses in question have long since passed into the hands of consumers. The monetary value of the benefit received by the defendant has been definitely established. There is no question as to the solvency of the defendant. Therefore, the Court will effect restitution by the entry of a money judgment against the defendant in the sum of $19,-237.36 with interest thereon at the rate of five per cent per annum from August 28, 1952.