224 F.2d 493
 LAWRENCE WAREHOUSE COMPANY, a corporation, Appellant,
v.
Hugh J. TWOHIG, Louis McLaughlin, William S. Brown and
Harold C. Torkelson, d/b/a Wagner, Garrison &
Abbott, Appellees.
Hugh J. TWOHIG, Louis McLaughlin, William S. Brown and
Harold C. Torkelson, d/b/a Wagner, Garrison &
Abbott, Appellants,
v.
LAWRENCE WAREHOUSE COMPANY, a corporation, Appellee.
 Nos. 15028, 15029.
 United States Court of Appeals Eighth Circuit.
 July 14, 1955.
Rehearing Denied Aug. 8, 1955.
 
 Charles O. Butler, Chicago, Ill. (Maynard Garrison, Wallace, Garrison, Norton & Ray, San Francisco, Cal., Harry H. Miller, Sifford & Wadden, Sioux City, Iowa, with him on the brief), for Lawrence Warehouse Co.
 Kenneth T. Wilson and Charles F. Stilwill, Sioux City, Iowa (Charles M. Stilwill, Sioux City, Iowa, with them on the brief), for Hugh J. Twohig and others.
 Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.
 JOHNSEN, Circuit Judge.
 
 
 1
 A livestock commission firm sued a warehouse company for restitution, on the alternative theories (a) that plaintiff was the owner of 100 beef carcasses, which had been placed in defendant's refrigerated warehouse and which defendant had allegedly converted to its own use, or (b) that plaintiff has such a beneficial interest in the carcasses, with defendant having knowledge of plaintiff's equitable rights, as to make defendant's appropriation or use of the carcasses, to take the place of other carcasses on which defendant had issued warehouse receipts, and to effect a discharge thereby of defendant's liability to the holders of those receipts for such other carcasses, an unjust enrichment in defendant's favor as against plaintiff.[1]
 
 
 2
 On a non-jury trial, the court held that plaintiff did not have legal title or possessory right to the carcasses and so was without any basis to sue for a conversion, but that on the circumstances of the situation plaintiff equitably had such a beneficial interest in the carcasses as would entitle it to restitution from defendant, on the basis of unjust enrichment occurring against it, for any pecuniary advantage or benefit which defendant could be shown to have received from a utilization of the carcasses to satisfy its obligation or liability for other carcasses under previously issued warehouse receipts. The court further declared, however, that the evidence did not establish the existence of any such enrichment in defendant's favor, from the utilization or disposition which had been made of the carcasses, except as to 62 out of the 100 carcasses. It accordingly gave plaintiff judgment for only part of the amount sought to be recovered. Both defendant and plaintiff have taken an appeal.
 
 
 3
 The facts of the situation have been carefully set out in the trial court's reported opinion, D.C., 118 F.Supp. 322. Only those immediately necessary to the questions on appeal will be repeated here.
 
 
 4
 Plaintiff, a livestock commission firm at Sioux City, Iowa, had agreed to make purchases of cattle on that market for Mid States Packing Co., Inc., a small meat packer of Milan, Illinois. Under the arrangement between them, plaintiff was to pay for all such cattle with its own funds, take out transit insurance on them in Mid States' favor as owner, and arrange for the shipment of them immediately by truck to Mid States' plant at Milan, Illinois. A draft was then to be drawn by plaintiff on Mid States, covering the advances made for purchase price and insurance premium and the amount of its commission-man's fees, with the draft to be sent through regular banking channels for payment at a bank in Rock Island, Illinois.
 
 
 5
 Mid States promised plaintiff that all such drafts would be paid promptly upon their arrival at the Rock Island Bank, and it further supplied plaintiff with a copy of a statement filed by it with the bank that it would accept and pay 'any and all drafts' drawn by plaintiff 'for payment of cattle.'The operations of Mid States throughout this period were being conducted on a shoe-string basis financially, but this fact was neither disclosed to nor known by plaintiff. The plan of having plaintiff pay for the cattle, ship them immediately to Milan, Illinois, and allow the commercial paper therefor to clear through a bank at Rock Island (which would be via Chicago channels) afforded Mid States a margin of several days time in which to receive the cattle, slaughter them, place the carcasses in defendant's warehouse, have defendant issue warehouse receipts on them, make use of the warehouse receipts to procure a loan from the Rock Island bank, and thereby get itself into a position to be able to make payment of plaintiff's draft when it arrived, This was the only way that it was possible for Mid States regularly as principal to reimburse plaintiff for the advances which it thus was making as agent.[2]
 
 
 6
 Defendant's warehouse manager at Milan, Illinois, knew of the agency relationship which existed in plaintiff's purchasing of cattle for Mid States; of plaintiff's advancing of the purchase price for such cattle as an incident of that relationship; of the arrangement for having plaintiff draw drafts in reimbursement and having Mid States make payment of them as soon as they arrived at the Rock Island bank; of the need and the plan of Mid States in its financial situation to get each of such shipments slaughtered, have warehouse receipts issued on the carcasses, and hurry the warehouse receipts to the Rock Island bank for a loan, before the draft of plaintiff covering the shipment should arrive for payment; and of the fact that only the use and results of this system had made it possible for Mid States to fulfill its obligation as principal of reimbursing plaintiff; had enabled Mid States to preserve the existence of the agency relationship on the part of plaintiff; and had been responsible for plaintiff having made purchase and shipment to Mid States of the 100 cattle, whose carcasses are here involved.
 
 
 7
 All of the foregoing facts were in substance or effect found by the trial court, and they all have a sufficient evidentiary basis in the record. The findings go further than this and-- also on a proper evidentiary basis-- constitute the situation as one where defendant's manager had had a direct part in assisting Mid States to carry on the financial game and race in which it was engaged, as a means of preserving plaintiff's agency relationship and the continuing of cattle-buying by it in Mid States' behalf. Defendant's warehouse was located at and run adjunctively to the meat-packing plant. Defendant had given its consent to its warehouse manager engaging in performing duties and functions for Mid States. What the manager thereafter principally did for Mid States was to keep records for it and handle many of the details of its financial transactions, such as having assignments of the warehouse receipts issued by him on carcasses of the cattle received from plaintiff duly executed by Mid States in favor of the Rock Island bank, and taking such assigned receipts to the Rock Island bank for loans, as such action became necessary on his part, in the process of making certain that the funds would be available at the bank to meet plaintiff's incoming draft.
 
 
 8
 The court still further found-- again upon a proper evidentiary basis-- that the acts of defendant's manager began, as time went on, to become fused even more than this into Mid States pillar-to-post operations. He commenced to make releases, on Mid States' request, of carcasses on which warehouse receipts had been issued, without obtaining authority therefor from the bank as assignee and holder of the receipt. An examiner of defendant (which operated a chain of warehouses throughout the country), on making a routine check of the operations of the Milan warehouse about a month before the events that are immediately here involved, discovered that such unauthorized releases of carcasses had been made and reported this fact to defendant. Three additional checkings of the warehouse's operations were thereupon made within a ten-day period, and these showed that the unauthorized releasing of carcasses by the manager had been repeated. Specific cautioning was then given the manager not to make any further releases of carcasses without prior authorization from the holder of the warehouse receipts covering them.
 
 
 9
 Two weeks later, however, defendant's manager, on Mid States' request, released 62 more carcasses, without authority from the bank as assignee and holder of the warehouse receipts issued on them, which carcasses Mid States desired to ship to a buyer in Chicago. These carcasses became the subject of 'hijacking', after they reached Chicago but before they had been delivered. During the time that the releasing and hijacking of these carcasses were occurring, plaintiff had made purchase for and shipment to Mid States of 100 cattle, whose carcasses are the ones that are involved in this suit,
 
 
 10
 Mid States took over the 100 cattle upon their arrival at the Milan plant and slaughtered them. The carcasses were duly put in defendant's warehouse, but Mid States and defendant's manager, who were then aware of the shortage problem confronting them from the carcasses which had been released and hijacked, did not undertake to subject the 100 carcasses to warehouse receipts, in accordance with the routine and practice of both of them in the past. Instead, they chose to protect themselves and leave plaintiff holding the sack, by using 62 of the carcasses to take the place of those hijacked, through fraudulently subjecting such carcasses to the operation of the warehouse receipts issued on the hijacked carcasses. In similar fashion, they further used the remaining 38 of the 100 carcasses to take the place of that number of carcasses under other previous warehouse receipts held by the bank.
 
 
 11
 All of the 100 carcasses were thereafter sold, with the proceeds going to the bank, under authorization of shipment and sale given by the bank in relation to the previous warehouse receipts; under a releasing by defendant's manager of the carcasses as being applicable to those receipts; and with satisfaction being by this means effected of the warehouseman's liability existing on the receipts. Thus, what defendant's manager accomplished, and what defendant gained in pecuniary benefit or advantage, from having the 100 carcasses so used, was to effect a discharge or satisfaction of defendant's legal accountability to the bank for the carcasses on which the receipts had been issued, and an escaping thereby of the need to produce or pay for those carcasses, as it otherwise would apparently have been required to do.
 
 
 12
 Making substituted security applicable to its receipts and palming off that security against the receipt holders as being the property on which the receipts had been issued constituted, of course, a general legal fraud on the part of the warehouseman. It was, however, not the holder of the receipts, but plaintiff, whom this improper legal conduct was designed to affect, through the intentional sacrificing of plaintiff's right and expectation of reimbursement to the gaining of personal exoneration for defendant and Mid States from the misdeeds which they had jointly committed as to the warehouse receipts.
 
 
 13
 And this collusive scheme, so far as defendant was concerned, was carried out, as the trial court found, in the inequitable shadows of its manager's express knowledge that the 100 carcasses represented cattle which plaintiff had purchased, shipped and was expecting reimbursement for in the channel of normal agency relationship; that plaintiff's drafts for the cattle were then in process of regular arrival at the bank and payment of them, as well as any chance that plaintiff could possibly have of obtaining reimbursement, was dependent upon the carcasses being made to serve that purpose, as had been the practice in the past; that any attempt by defendant to have the carcasses diverted to its previous warehouse receipts, or any request by Mid States upon it to have the carcasses applied in replacement of those for which defendant owed a legal accountability under its receipts-- whichever basis may have been the source of the collusive scheme involved-- would necessarily have the effect of producing a violation of Mid States' obligation and promise of reimbursement to plaintiff as its agent; and that this breach of fiduciary duty by Mid States, in intentionally depriving plaintiff of reimbursement and the only possible source for plaintiff to obtain it, was being participated in by defendant, not merely knowingly, but with a gaining of the direct benefit or advantage for itself of having the deprivation against plaintiff cover up and save defendant whole from its liability to its receipt holder for its misdeeds as warehouseman.
 
 
 14
 On all of this, it seems to us that it clearly would be entitled to be held that Mid States stood in a fiduciary relation, as principal, to plaintiff, as its cattle-purchasing agent, and so owed fiduciary duties and obligations appropriate generally to the trust and confidence inherent in the circumstances of the particular relationship; that Mid States' failure to reveal to plaintiff its need to get the money out of the very cattle purchased by plaintiff, if plaintiff was to receive or be able to effect reimbursement from it, and its use of the cattle in these circumstances to apply as substituted security under defendant's previous warehouse receipts, when only the wrongful conduct of itself and defendant in having diverted or released the security legally applicable to such receipts was responsible for the need and desire to make this use, and when the use was being made to cover up or insulate against the misdeeds of defendant and itself in making the security releases, constituted a breach of such fiducial faith and conduct as plaintiff had a right to assume would characterize their agency dealings and relationship; that the breach of fiducial faith and conduct involved in the use so made of the carcasses was one that was and only could be the product of participation and collusion on the part of defendant, through its having made improper shiftings or releases at Mid States' request of security legally covered by its receipts, through its having permitted the 100 carcasses to be substituted or used in replacement of security under its receipts, and through its having utilized the carcasses to satisfy or discharge the obligation of its receipts, while at the same time knowing and being willing that these improper warehouseman's acts and the saving of itself harmless from their consequences would operate to deprive plaintiff of the only possible source of reimbursement for its purchase-price outlay as Mid States' agent; and that the effecting of a discharge or satisfaction in this shadowy manner of the liability existing upon the warehouse receipts had resulted in defendant receiving a direct benefit or advantage from the carcasses, which was an inequitable one against plaintiff in the circumstances, and which constituted an unfair or unjust enrichment as between them.
 
 
 15
 Some of the general principles, in relation to which the situation is entitled to be viewed and evaluated, may be briefly stated. A principal has the obligation of exercising good faith toward his agent in the incidents of their relationship. He is subject to the responsibility in favor of the agent of using care 'to prevent harm coming to the agent in the prosecution of the enterprise,' and this extends in general to his 'disclosing facts which, if unknown, would be likely to subject the agent to pecuniary loss.' Restatement, Agency, 435, Comment a. He has a duty to reimburse the agent for all authorized payments made in his behalf. Id. § 439. Any direct attempt on his part to impede or make impossible the obtaining of such reimbursement by the agent is a breach of fiducial faith and duty.
 
 
 16
 'A third person who has colluded with a fiduciary in committing a breach of duty, and who obtained a benefit therefrom, is under a duty of restitution to the beneficiary.' Restatement, Restitution, § 138(2). Or, as Professor Scott puts it-- 'Where a person in a fiduciary relation to another violates his duty as fiduciary, a third party who participates in the violation of duty is liable to the beneficiary. If the third person makes a profit through such participation, he is chargeable as constructive trustee of the profit so made.' 3 Scott on Trusts § 506.
 
 
 17
 The term 'benefit', for purposes of restitution, denotes any form of advantage received, which is capable of having its value measured, and it accordingly includes the advantage of being saved from an expense or loss. Restatement, Restitution, § 1, Comment b. Any benefit received by one person as against another is entitled to be regarded as an unjust enrichment, 'if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.' Id. 1, Comment c.
 
 
 18
 We are persuaded, as was the trial court, that Illinois law, by which the case is admitted to be governed, accepts and would apply all of these general principles in an appropriate situation. In attempting to make reasonable application of them here to the facts that are involved, on the basis of sound equitable conscience and remedial concept, it is our view and holding, as a matter of law, that defendant's use of the 100 carcasses, to cover up and save itself harmless from its improper warehouseman's acts in making releases of security from the application of its warehouse receipts-- particularly when, as here, its own participation or collusion with Mid States, in permitting such releases to be made, was responsible for the need to effect a substitution or replacement; when the result was, and it was known to defendant that it would be, to prevent Mid States from fulfilling its fiduciary duty to plaintiff of making reimbursement, and to cause Mid States in the circumstances to breach the trust and confidence of plaintiff's relationship to it; and when defendant was itself by this means enabled to escape liability upon its warehouse receipts and to have its obligation to the holder discharged for the carcasses improperly allowed to be taken out of the application of its warehouse receipts-- amounted in the situation to an unjust enrichment, in that, as between the knowledge, conduct and position of plaintiff and defendant, and in relation to the consequences involved, it constituted a benefit (capable of value admeasurement), which, on the basis of equitable conscience, it was unfair for defendant to have received, and which it would be unfair to allow defendant to retain.
 
 
 19
 As we have previously indicated, however, the trial court did not feel that the situation warranted the granting of restitution, except as to the 62 carcasses which had been used in substitution or replacement for the carcasses which defendant had allowed to be released and which had become hijacked. The court said: 'The plaintiff has clearly and satisfactorily established its right to restitution as to the 62 carcasses. The plaintiff has not so established its right to restitution as to the 38 carcasses. As to the 38 carcasses there is no clear and satisfactory showing that the defendant was a 'subsequent transferee' or that the defendant was enriched by its connection with them. So far as the record shows, the defendant may have been no more than a conduit.' 118 F.Supp. at page 330.
 
 
 20
 But the evidence undisputably established, and the trial court's findings so recognized, that all of these 38 carcasses, just the same as the 62 carcasses for which restitution was granted, were made to have application to previous warehouse receipts in place of other carcasses which defendant was supposed to be holding as the security or property covered by the receipts, and that they, similarly as the 62, were used to effect a discharge or satisfaction of the obligation of defendant to account for those other carcasses under its receipts. The only way in which the situation as to the 38 carcasses differs from that as to the 62 is that the record does not show what became of the 38 carcasses covered by the receipts, for which those here involved were used in substitution or replacement.
 
 
 21
 We do not, however, see how that fact can have any materiality on the question of whether defendant received a benefit from its use of the 38 carcasses here involved, unless, of course, the carcasses covered by the receipts happened to have been turned over to plaintiff or used to help pay plaintiff's claim, of which there is here neither contention nor proof. Whatever became of the carcasses covered by the receipts-- whether they were permitted by defendant to enure to the benefit of Mid States or somebody else-- the controlling circumstance here is that the 38 carcasses in suit were in fact used by defendant as substituted security for its receipts and enabled it to escape having to produce or account for those which its receipts covered. Hence, just as much as in the case of the 62 carcasses used to replace those hijacked, defendant's use of the 38 carcasses in substitution or replacement of that number of other carcasses under its receipts caused it to receive the benefit of not having to produce or account for those carcasses and of obtaining a discharge of its liability for them under its receipts.
 
 
 22
 Substitution or replacement of security under its receipts was capable of being accomplished only by defendant's own release of the carcasses covered by the receipts, since it had the control of the warehouse. It had a liability to account for those carcasses on its receipts, and when it improperly used the 38 carcasses here involved as substitutions or replacements for making that accounting and for effecting the discharge of its own liability to the receipt holder, it no less received a benefit, and no more had a basis for being regarded as a mere conduit, than in its use of the 62 carcasses to replace those hijacked.
 
 
 23
 Plaintiff is accordingly entitled to a judgment for the full amount for which it sued. To enable this to be conveniently accomplished, the judgment of partial recovery allowed by the trial court will be vacated, and the case will be remanded for the entry of a new judgment. The costs on appeal, including the supplemental record printed by plaintiff, will be taxed to defendant.
 
 
 24
 Judgment vacated and case remanded for entry of another judgment.
 
 
 
 [1]
 The livestock commission firm was a partnership, and the suit was brought by its members jointly. They will be referred to collectively in this opinion as plaintiff
 
 
 [2]
 The commission-man's fees included in the drafts represented only a trivial portion of their amounts. Thus, on the 100 cattle which are here involved, the drafts totalled $30,089.94, of which only $103.50 was for commission-man's fees, with the rest constituting money which plaintiff had advanced