LEONARD L. WOLFER and MARK W. WOLFER, Plaintiffs and Defendants on Counterclaim and Third-Party Plaintiffs-Appellants, *v.* THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, a New York corporation, ROBERT E. SCHOCH, individually and as General Agent of THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, and KEY RESOURCES, INC., a New York corporation, Defendants and Counterclaimants-Appellees, *v.* LAWRENCE M. HOROWITZ, EUGENE R. FURR, JOEL CRIZ, DAVID NATTENBERG, and JERRY F. SNOW, Third-Party Defendants, Counterclaimants, and Cross-Claimants

NO. 7484

(CIVIL NO. 51661)

MARCH 5, 1982

HAYASHI, C.J., PADGETT, J. AND CIRCUIT JUDGE KANBARA
IN PLACE OF ASSOCIATE JUDGE BURNS, DISQUALIFIED

## OPINION OF THE COURT BY PADGETT, J.

This is an appeal from a summary judgment order made final by a Rule 54(b), HRCP, certification in favor of defendants against plaintiffs on a complaint based on alleged fraud. We affirm.

Certain basic facts are undisputed. Appellants were life insurance salesmen representing Appellee Mutual Life Insurance Company of New York (hereinafter "MONY"). Appellee Schoch was the general agent of Mony in Hawaii under whom appellants worked. Mony had developed what was called a prime sales program pursuant to which persons purchasing life insurance could finance the payment of the premiums therefor by borrowing money from Appellee Key Resources, Inc. (hereinafter "KEY"), a subsidiary of Mony. In order to be able to sell under the prime program, salesmen, such as appellants, had to enter into an agreement with Mony under which they guaranteed the repayment of the loan which the insurance purchasers made with Key. The documents executed by the appellants clearly and unambiguously set forth the unconditional guarantee of the appellants. According to the documents in evidence, Appellant Leonard Wolfer first entered into such an arrangement on May 22, 1973; then again on December 10, 1973; and on January 4, 1974. Appellant Mark Wolfer entered into such an arrangement first on April 19, 1973; again on December 10, 1973; again on January 4, 1974; and finally, on July 29, 1974.

The present action concerns guarantees made by the appellants after executing the December 10, 1973 agreement. Essentially, what happened is that they sold insurance under the program to persons who borrowed money from Key and subsequently defaulted. A portion of the commissions which appellants had received on the sales had been put into escrow and upon the default, Key called upon Mony for payment of those sums as well as other contingent commissions due appellants from Mony.

Appellants' suit is for damages alleging fraud on the part of the appellees in procuring the guarantees from them.

Rule 9(b), HRCP, requires that averments of fraud be stated with particularity. As has been said:

> The general assertion of "fraud" or "fraudulent conduct" serves no informative function and therefore is insufficient to raise an issue as to fraud without supporting particulars.

5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298 at 415 (1969). With this in mind, we begin our consideration of the issue before the court below with an examination of the complaint. The allegations with respect to fraud are laid down in paragraphs 3, 4, 5, 6, 7 and 8.

Paragraph 3 is a general allegation without particulars that the appellees, through Appellee Schoch, fraudulently induced the appellants to enter into the December 10, 1973 and July 29, 1974 agreements.

Paragraph 4 is that the appellees, again acting through Appellee Schoch, knowing that the appellants were to be provided with a copy of the entire agreement before execution and were to have fully understood the same, failed to provide the copies and had actual knowledge that the appellants did not understand the agreement.

Paragraph 5 alleges that appellees fraudulently failed to provide a specialized training course to appellants as required under the agreements.

Paragraph 6 alleges that appellees, acting through Schoch, urged the appellants not to fully examine the agreements before executing the same with knowledge that as a result of their not reading and examining the agreements, they could not have knowledge of the actual provisions thereof.

Paragraph 7 alleges that as a result of the fraud and false representations of the appellees, appellants were made guarantors of the payment of the premium loans.

Paragraph 8 alleges that the appellants relied upon the fraudulent representations of the appellees in entering into the agreements and would not have entered into the agreements but for those fraudulent representations.

Thus, under the complaint, the three particulars alleged in accordance with the rule were: (1) that appellees fraudulently failed to provide a copy of the entire agreement to the appellants before executing; (2) that appellees fraudulently failed to provide a spe-

cialized training course; and (3) that appellees fraudulently urged the appellants not to fully examine the entire agreement before executing the same.

Appellees moved for summary judgment, attaching numerous exhibits. They thereafter supplemented their exhibits on two occasions, apparently without first obtaining leave of court to do so. No objection, however, is here raised to the supplementation. Of course, under Rule 56(e), HRCP, we cannot consider Exhibit 5, which is a newspaper clipping since it would be inadmissible at trial nor can we consider Exhibits 13(a) through (n) since they are neither certified nor sworn to; nor can we decide any disputed issue of material fact.

The various agreements with respect to the prime sales program executed by the appellants appear as Exhibits 8(a) through (g). They are certified to by the affidavit of Robert E. Schoch, which appears as Exhibit 4 and they clearly and unambiguously set forth the unconditional guarantee by the appellants of the payment of the premium loan of the insurance purchasers.

The depositions of the appellants were not taken nor are any exhibits offered by the appellants in opposition to the motion for summary judgment. They rely upon their affidavits as the basis for raising a genuine issue of material fact.

The two affidavits, one by each appellant, which are virtually identical, appear to have been drawn carefully and with great skill. They are remarkable for what they do not assert. Thus, they do not assert, as alleged in paragraph 4 of the complaint, that they were not provided with copies of the entire agreement before execution or that they did not understand the entire agreement before execution; nor do they assert, as alleged in paragraph 6 of the complaint, that the appellees, through Appellee Schoch, urged them not to fully examine the agreements before executing the same.

Moreover, they do not assert that appellants did not read the agreements before executing them nor even that they did not understand when they executed them that they were to become unconditional guarantors of the full repayment of the premium loans. Exhibits 11(a) through (n) are letters from appellants to various insureds signed by appellants and the insureds. The first is dated January 29, 1974, only forty days after the December 10, 1973 agreement while the last is exactly twenty-three months later. Each

contains the statement that "Both the Manager of my agency office and I will guarantee your note to Key in order to assist you in securing the loan." It is not therefore surprising that appellants did not, in their affidavits, swear they did not understand the guarantees.

The affidavits aver in paragraph 7:

I signed documents having to do with the sale of financed insurance under the Prime Program at the urging and insistence of Robert E. Schoch, the then manager of the Hawaii agency for the Mutual Life Insurance Company of New York. All the documents, including guarantees of the payment of the loan balance to Key Resources, Inc., that I signed were at the urging and upon the representation of Robert E. Schoch that this was a great sales tool and we would make a lot of money by the use of this plan. It was never explained to me that I was guaranteeing to pay the entire debt of the policyholder in the event of a default. Mr. Schoch mentioned that the only liability that an underwriter could possibly have would be the temporary loss of funds which were held in the escrow account.

Thus, by the very wording of paragraph 7, the "representations" upon which appellants relied in executing the agreements were that the prime program was a great sales tool and appellants would make a lot of money by its use. The statement as to the liability of an underwriter is not characterized as a "representation" but only as something that was "mentioned". It is not alleged to have been a statement upon which appellants relied in executing the agreements. In paragraph 9, the affidavits state:

I relied on the representations of Robert E. Schoch who was my superior in the company and would not have become involved in the Prime Program without same.

We note that neither the alleged "representation" that the prime program was a great sales tool from which appellants would make a lot of money nor the "mention" of the extent of their liability appears in the complaint as one of the particulars of fraud.

Moreover, the affidavits do not allege that the "representation" that the prime program was a great sales tool from which the appellants would make a lot of money was false. The documents establish that appellants sold over $2 million face value life insurance under

the program. Exhibit 7(A) indicates that on one policy of $100,000 face value, they earned a gross commission of $1,102. Thus, not only is there no averment that the representation was false, it does not appear to be false on the face of the record.

As the Supreme Court has said:

> To support a finding of fraud, it must be shown that "the representations were made and that they were false, . . . [and] that they were made by the defendant with knowledge that they were false, (or without knowledge whether they were true or false) and in contemplation of the plaintiff's relying upon them and also that plaintiff did rely upon them." *Hong Kim v. Hapai*, 12 Haw. 185, 188 (1899).

*Kang v. Harrington*, 59 Haw. 652, 656, 587 P.2d 285, 289 (1978). *Accord*, 37 AM. JUR.2d, FRAUD AND DECEIT, § 42 (1968). Paragraph 7 simply does not make any averments sufficient to create a genuine issue of material fact as to the necessary elements of fraud.

The same is true of paragraph 15 of the affidavits, in which appellants state:

> Had I been fully informed about the program and had known the full impact of agreeing to guarantee the debt of another I would not have become involved in the program.

The affidavits aver in paragraph 16 that due to the failure of the appellees to give the appellants the necessary training, the prime program was a complete failure resulting in 24 defaults out of 52 policies sold.

As to the matter of the lack of training, again, it is not alleged that the appellants entered into the agreement as a result of the lack of training. Apparently, what appellants are attempting to say in paragraph 16 of their affidavit is that, because of the lack of training, they sold insurance to people who subsequently defaulted on the premium loans. The problem with this is that agreements with the same mention of training were executed in April and May of 1973 and again in December of 1973. All of the sales which are the bases of the complaint, followed the December agreements. Thus, when appellants commenced the sale under the program, over six months had gone by, during which they knew they had not received the specialized training they now claim they were entitled to, and yet they commenced the sales anyway.

Without appellants having made sales to insurance buyers who

defaulted, there could have been no liability under the guarantees, since it was the defaults which gave rise to the liability and to the damage here claimed. But since appellants knew that they had not received the specialized training, they could not have been relying on the promise of specialized training in making the sales in question. Reliance, of course, is a necessary element of fraud. *Kang v. Harrington, supra; Hong Kim v. Hapai, supra;* 37 AM. JUR.2d, FRAUD AND DECEIT, *idem.* When appellants entered the original agreements, they may have been relying upon receiving specialized training before commencing sales, but certainly when seven months later, after again executing essentially the same agreements, they commenced sales, they could not have been relying upon receiving such training before making sales and in fact, they do not so aver in their affidavits. Thus, paragraph 16 does not raise a genuine issue of material fact as to fraud.

The remaining allegations in the affidavits are equally insufficient to establish the elements of fraud.

We see nothing in the relationship of the parties as set forth in appellants' affidavits nor in the facts sworn to in those affidavits to establish either actual or constructive fraud.

> The Supreme Court of this State has recently stated:
>
> . . . we would apply to the instant case the general rule "that fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise."

*Stahl v. Balsara,* 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978). *Aloha Petroglyph v. Alexander & Baldwin,* 1 Haw. App. 353, 354, 619 P.2d 518, 519 (1980).

Appellants complain that when the insureds to whom they had sold the policies defaulted, Appellee Key failed to take legal action against the insureds to collect on the notes. However, the appellants expressly waived such action in the agreements (*see,* Exhibit 8A, for example).

Appellants assert, however, that the agreements they entered into with the appellees lacked consideration and were therefore void.

In their affidavits, paragraph 13, appellants state:

I received no benefit, either financial or otherwise, for my participation in the Prime Program of selling financed insurance and received absolutely nothing of value for my guarantees, which were given to the company's insureds.

We take the averments of paragraph 13 as being a conclusion drawn from the fact that because of numerous defaults, the commissions they earned for the sale of the policies were eaten up by the guarantees. We do not take the averments of paragraph 13 as being factual statements that no consideration passed to appellants as a result of the execution of the agreements in question, since it is undisputed that without the execution of the agreements, appellants could not have participated in the prime program and, thus, could not have made sales under that program and since it is further undisputed that as a result of sales made under that program, commissions did pass to the appellants. *See* Exhibits 7(a) through (d).[1] We find no genuine issue of material fact as to whether appellants did receive legal consideration for the guarantees.

Appellants also assert that there was failure of performance of appellees' obligations under the contract and that that alone would entitle them to damages and thus, overcome a motion for summary judgment. The failure to which appellants are adverting is the failure to provide them with the specialized training which they claim, under the contract, appellees promised to furnish. But all of appellants' damages arise out of their being called upon to make good upon the guarantees, all of the guarantees arise out of appellants' sales under the program, and all of the sales were made by appellants with full knowledge that they had not received the specialized training they now claim they were entitled to. If, therefore, there was a default on the part of the appellees in furnishing the

---

[1] We are unwilling to construe the affidavits as an assertion that the passage of money to appellants as recited by them in Exhibit 7(a) did not, in fact, happen. Appellants have not disavowed Exhibit 7(a) and we do not think the appellants intended to swear falsely in their affidavits.

training, that default was, in the circumstances, *damnum absque injuria.* There is no genuine issue of material fact as to whether the alleged default caused appellants any of the damages which they are claiming.

Since this was a judgment certified under Rule 54(b), HRCP, the judgment is affirmed but the case is remanded for further proceedings.

Judge Kanbara dissents. His dissenting opinion will be filed at a later time.

*Mark S. Davis* for appellants.

*William S. Miller (Richard E. Stifel* with him on the brief, *Goodsill, Anderson & Quinn* of counsel) for appellees.

## DISSENTING OPINION OF CIRCUIT JUDGE KANBARA

I respectfully dissent.

This is an appeal from a summary judgment order in favor of defendants-appellees against plaintiffs-appellants on a complaint based on alleged fraud.

The focal question is whether or not a genuine issue of material fact exists.

As stated in *Lau v. Bautista,* 61 Haw. 144, 146-7, 598 P.2d 161, 163 (1979):

> Under H.R.C.P., Rule 56(c) a summary judgment will be sustained only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citations omitted.] Inferences to be drawn from the record must be viewed in the light most favorable to the non-moving party. [Citations omitted.]

*Accord, Windward Partners v. Lopes,* 3 Haw. App. ___ (No. 7795, decided February 18, 1982).

So viewing the evidence, we cannot say that no genuine issue of material fact exists.

The Mutual Insurance Company of New York (hereinafter "MONY") devised a premium financing plan called the Prime Plan. It was designed for persons who may immediately want or need a

substantial amount of insurance but cannot currently afford the premiums on such policies but who may have good future income potential. These included medical students, residents and interns, certain other students and certain businessmen.

From 1960 through 1970 a forerunner of the Prime Plan provided for financing by local banks. Insurance agents were required to guarantee the loans.

Since 1970, MONY provided for premium financing through its wholly-owned subsidiary, Key Resources, Inc. (hereinafter "Key"). It was intended for clients who could not obtain bank financing. From 1970 to 1973, insurance agents were not required to guarantee the loans. Appellants assert that the default rate was 15 to 20 per cent. (Opening Brief at 9.) Appellees state that this was not the default rate but was the delinquent or slow pay rate in the college market. (Answering Brief at 9.)

In early 1973, MONY revised the Prime Plan. It required the insurance agent personally to guarantee the loan and to deposit 20 per cent of the first year's commission into an escrow account.

Under the premium financing plan, Key would agree to finance a client's premiums for a certain number of years. It would charge the maximum legal rate of interest. The insured would make monthly payments to Key covering interest and part of the premium advanced by Key. These monthly payments were substantially less than the regular premiums would have been. At the end of the repayment period, a balloon payment, often of several thousand dollars, is due. It is either refinanced or offset against the cash surrender value of the policy.

In the event of default at any time, Key would receive the cash value of the policy and then the amount in the agent's escrow account. If these amounts were insufficient, then Key would receive the agent's accrued commissions and various retirement, incentive program and profit-sharing funds. If these were insufficient, Key presumably could recover from other assets of the agent.

Appellants, Leonard Wolfer and Mark Wolfer, who are father and son, respectively, began to work for MONY on December 1, 1972. Neither had any prior experience in the insurance business.

After appellees revised the Prime Plan in early 1973, appellants executed agreements with appellees to participate in the Prime Plan. Leonard Wolfer first executed such an agreement on May 22, 1973

and Mark Wolfer on April 19, 1973. They sold Prime Plan policies from December 1973 until November 1975.

From late 1974 and thereafter, a number of their clients defaulted, and appellants were required to comply with the guaranty provisions.

Appellants brought action for damages alleging fraud on the part of appellees in procuring the guaranties from them.

Their complaint alleges that appellees, through Appellee Schoch, who was the general agent of MONY in Hawaii and under whom appellants worked, fraudulently induced them to enter into the participation agreements; that Schoch, knowing that the appellants were to be provided with a copy of the entire agreement before execution and were to have fully understood the same, failed to provide the copies and had actual knowledge that the appellants did not understand the agreement; that appellees fraudulently failed to provide a specialized training course to appellants as required under the agreements; that appellees, acting through Schoch, urged the appellants not to fully examine the agreements before executing the same with knowledge that as a result of their not reading and examining the agreements, they could not have knowledge of the actual provisions thereof; that as a result of the fraud and false representations of the appellees, appellants were made guarantors of the payment of the premium loans; and that the appellants relied upon the fraudulent representations of the appellees in entering into the agreements and would not have entered into the agreements but for those fraudulent representations.

Appellees filed a motion for summary judgment.

In opposition thereto, appellants filed their affidavits, which were virtually identical.

Paragraph 7 in each affidavit avers:

I signed documents having to do with the sale of financed insurance under the Prime Program at the urging and insistence of Robert E. Schoch, the then manager of the Hawaii agency for the Mutual Life Insurance Company of New York. All of the documents, including guarantees of the payment of the loan balance to Key Resources, Inc., that I signed were at the urging and upon the representation of Robert E. Schoch that this was a great sales tool and we would make a lot of money by the use of

this plan. It was never explained to me that I was guaranteeing to pay the entire debt of the policyholder in the event of a default. Mr. Schoch mentioned that the only liability that an underwriter could possibly have would be the temporary loss of funds which were held in the escrow account.

Paragraph 9 of each affidavit avers that affiant
relied upon the representations of Robert E. Schoch who was my superior in the company and would not have become involved in the Prime Program without same.

Paragraph 14 avers that
I received no specialized training nor was I adequately informed about the Prime Program from the company or from my office manager, Robert E. Schoch.

Paragraph 15 avers that
Had I been fully informed about the program and had known the full impact of agreeing to guarantee the debt of another, I would not have become involved in the program.

Fraud has been broadly classified as either actual or constructive. 37 AM. JUR.2d, FRAUD AND DECEIT, § 4.

Actual fraud contemplates intentional deception, including false and fraudulent misrepresentations. *Ibid.; Dobison v. Bank of Hawaii*, 60 Haw. 225, 226, 587 P.2d 1234, 1235 (1978).

Constructive fraud is defined as an act done or omitted which is construed as a fraud by the court because of its detrimental effect upon public interests and public or private confidence, even though the act is not done or omitted with an actual design to perpetrate actual fraud or injury. 37 AM. JUR.2d, FRAUD AND DECEIT, § 4.

Constructive fraud often exists where the parties to a transaction have a special confidential or fiduciary relation which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other. *Id.*, § 5.

Relationships between trustee and beneficiary, principal and agent, and attorney and client are familiar examples in which the principle of fiduciary or confidential relationship applies in its strictest sense. Its operation, however, is not limited to dealings between parties standing in such relations, but extends to all instances when a fiduciary or confidential relation exists as a fact, in

which there is confidence reposed on one side and a resulting superiority and influence on the other. *Id.,* § 16.

Generally, a principal-agent relation exists between an insurance company and its agents. 43 AM. JUR.2d, INSURANCE, § 146.

As stated in *Montgomery Ward & Co., Inc. v. Tackett,* 163 Ind.App. 211, 216-7, 323 N.E.2d 242, 246 (1975):

> The relationship of principal and agent is confidential and fiduciary, binding the agent to the exercise of utmost good faith. [Citations omitted.] Likewise, the principal owes to the agent the obligation of exercising good faith in the incidents of their relationship and must use care to prevent the agent from suffering harm during the prosecution of the agency enterprise. *Lawrence Warehouse Co. v. Twohig* (8th Cir. 1955), 224 F.2d 493. *See also,* 3 Am. Jur.2d, *Agency,* § 238; 3 CJS, *Agency* § 318; Restatement (Second) of Agency § 435 (1957).

A threshold issue is whether or not a fiduciary or confidential relation existed between appellees and appellants. Appellants assert that such a relation existed. Appellees assert the contrary. Whether or not such a relation existed depends on evidentiary facts and the weight to be accorded thereto. These are not determinable from the pleadings or the exhibits and affidavits submitted on the motion for and against summary judgment. Hence, a dispute exists on this issue.

Contracts of guaranty create a contractual relationship which requires fair, full and frank disclosure of all relevant facts. 37 AM. JUR.2d, FRAUD AND DECEIT, § 147. Likewise, if one party to a contract has superior knowledge or means of knowledge which are not open to both parties alike, he has a duty to make such disclosure. *Id.,* § 148. It would appear that an insurance company that is requiring its agents to guarantee obligations of its insureds to it has a duty of full disclosure to its agents.

We note that MONY designed the Prime Plan after over a decade of experience, presumably aware of the benefits and perils to itself and to its agents. Appellees occupied a position of superior knowledge and experience over the agents.

It is further noted that the Prime Plan is heavily weighted in favor of MONY and Key and against appellants. The companies collect premiums and interest from a class of customers who cur-

rently cannot afford the premiums to which they are committing themselves. Thus, they are greater credit risks than purchasers who require no financing or who qualify for bank financing. The companies minimize this risk to themselves by having the agents unconditionally guarantee any indebtedness. They further minimize such risk by requiring the agent to deposit a portion of his commissions into a fund, by providing that the companies could avail themselves of monies in this fund, any other monies that may be due from the companies to the agent and apparently ultimately his personal assets in enforcing the guaranty, and by requiring that the agent, not the companies, bring any legal action against a defaulting customer.

The gravamen of the complaint, as amplified in appellants' affidavits, is that appellees had made misrepresentations and had failed to disclose material facts about the program, and that appellants had relied on appellees to their detriment.

Appellees place great reliance on the Participation Agreements between MONY, Key and the appellants and on certain form letters from appellants to their clients in which the agent states that he unconditionally guarantees full payment of net loss on all defaulted premium loans on policies sold by him. These were attached as exhibits to their motion for summary judgment. This is evidence that is entitled to great weight but is not dispositive. They do not indicate the circumstances and manner in which the Prime Program was presented to appellants.

Appellants assert that appellees misrepresented the agents' potential liability under the program or failed to disclose material information that was necessary to an informed decision on whether or not to participate. For example, paragraph 6 of the Participation Agreement states that Key "will make every reasonable effort to effect collection" before requiring the underwriter to pay the defaulting customer's debt.[1] Also, the loan agreement between Key and an insured provides that upon default the "outstanding loan

---

[1] The Participation Agreement, para. 6, states that "although KEY under normal circumstances will make every reasonable effort to effect collection, I [the underwriter] waive any right to require that *such action* by [sic] brought by KEY against said borrowers in default on repayment of their premium loans." [Emphasis added.] This can be read to mean that "every reasonable effort to effect collection" under normal

shall, at KEY's discretion, be referred to an attorney for collection, . . ." Ex. 10A, para. 10.

Paragraph 6 of the Participation Agreement, coupled with said paragraph 10, is susceptible of an interpretation that "under normal circumstances" the company would refer delinquent accounts to an attorney for collection before seeking recourse against its agent.

However, the company construed "every reasonable effort to effect collection" to mean writing letters and telephoning the delinquent client, "short of going to a collection attorney." Ex. 7C, letter of Homer Wood, 2d Vice President for Market Development of MONY, to Schoch dated January 6, 1975.

The lack of clarity and appellants' contrary interpretation of paragraph 6 in the Agreement are indicated in Schoch's letter to Wood on December 30, 1974 (Ex. 7B) and Leonard Wolfer's letter to Wood dated January 13, 1975 (Ex. 7D). If the company's policy was as stated in Wood's 1975 letter, was this disclosed to appellants in 1973 and 1974 when they executed the Participation Agreements? This was an important consideration with respect to an agent's exposure to financial risk and liability for legal fees, for if the company were to exhaust its legal remedies against the defaulting purchaser before requiring the agent to make good, the agent's risk would be substantially less than if the company were not to do so and simply proceed against the agent. Consequently, such disclosure could have a significant bearing on an agent's decision on whether or not to participate in the program. Its disclosure after appellants had made numerous sales and after defaults had occurred was too late.

Another unclear area is the extent of instruction given by appellees to the agents on how to evaluate a client's credit-worthiness. Appellants' complaint about appellees' failure to provide specialized training may be pertinent to this issue.

In this connection, it is noted that when a bank finances a premium loan, it could be expected, in its own self interest, to evaluate carefully a borrower's credit-worthiness. The Prime Plan was in-

---

circumstances would include legal action by Key. The waiver by the underwriter does not prohibit the company from taking legal action against defaulting customers. Indeed it suggests that "under normal circumstances" it would. The company's policy in this regard would appear to be a material fact that should have been disclosed.

tended for customers who do not obtain bank financing. Thus, the insurance agent does not have the benefit of a bank's independent professional credit analysis, as he did in the 1960-70 version of the Plan. Accordingly, his exposure to financial loss is increased. The companies, on the other hand, have the safeguard of the agent's unconditional guaranty of the loan. This diminishes the companies' exposure to loss and may accordingly diminish their incentive to be critical in evaluating a prospective purchaser's credit-worthiness.

The nature of the relationship between appellants and appellees, the relative sophistication and the extent of knowledge of each concerning the details of the program, whether there had been misrepresentation, failure of disclosure of material facts, or over-emphasis on the Prime Plan as a selling tool and undue minimization of the risks to underwriters are issues of material fact that exist.[2] These kinds of issues are peculiarly dependent on the facts and circumstances of each case for their resolution. *See Adair v. Hustace, et al.,* 64 Haw. ____, n.7 (No. 6589, decided February 9, 1982). The parties should have been afforded a reasonable opportunity to present evidence bearing on these issues. *See City and County of Honolulu v. Midkiff,* 62 Haw. 411, 418, 616 P.2d 213, 218 (1980).

The proferred facts and the inferences that may be drawn therefrom are reasonably susceptible to conflicting interpretations. Under the circumstances, the granting of the appellees' motion for summary judgment, in my opinion, was improvident. *Fry v. Bennett,* 59 Haw. 279, 280, 580 P.2d 844, 846 (1978); *Kawaihae v. Hawaiian Insurance Companies,* 1 Haw. App. 355, 362, 619 P.2d 1086, 1091 (1980).

---

[2] "It is true that as a general rule, mere expressions of opinion, honestly and dutifully given, do not constitute actionable fraud . . . However, this rule, by its very terms, hinges upon factual questions concerning the knowledge and motives of the persons stating the opinion." *Montgomery Ward & Co., Inc. v. Tackett,* 163 Ind. App. 211, 221, 323 N.E.2d 242, 248 (1975).